**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CUMULUS MEDIA HOLDINGS INC. and CUMULUS MEDIA INC., | Electronically Filed |
| Plaintiffs, | Case No. 16-cv-9591 (KPF) |
| –against– | |
| JPMORGAN CHASE BANK, N.A., as Administrative Agent under the Amended and Restated Credit Agreement among Cumulus Media Inc., Cumulus Media Holdings Inc., as Borrower, Certain Lenders, Royal Bank of Canada, and Macquarie Capital (USA) Inc., as Co-Syndication Agents, and Credit Suisse AG, Cayman Islands Branch, Fifth Third Bank, Goldman Sachs Bank USA and ING Capital LLC, as Co-Documentation Agents dated as of December 23, 2013, | |
| Defendant, | |
| –and– | |
| ACIS CLO 2013-1 LTD., *et al.*, | |
| Defendant-Intervenors. | |
| ACIS CLO 2013-1 LTD., *et al.*, | |
| Counterclaim-Plaintiffs, | |
| –against– | |
| CUMULUS MEDIA HOLDINGS INC. and CUMULUS MEDIA INC., | |
| Counterclaim-Defendants. | |

**TERM LOAN PARTIES' MEMORANDUM OF LAW IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

**ARNOLD & PORTER**
**KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Tel.:  (212) 836-8000
Fax:  (212) 836-8689

*Attorneys for the Term Loan Parties*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    Cumulus and Its Highly-Leveraged Capital Structure............................................ 3

    B.    The Term Loans Are Underwater and the Unsecured Notes Are Out of the Money ................................................................................................................. 5

    C.    Cumulus and Certain Unsecured Noteholders Devise an Improper Exchange Offer ................................................................................................... 6

    D.    The Credit Market Analysts React Unfavorably to the Announcement of the Exchange Offer ......................................................................................... 8

    E.    Overview of the Credit Agreement .................................................................. 9

LEGAL STANDARD .............................................................................................. 9

ARGUMENT ....................................................................................................... 10

I.    Cumulus's Proposed Amendments to the Credit Agreement Violate Section 8.16 of the Credit Agreement Because They Materially and Adversely Affect the Interests of the Lenders ........................................................................................ 11

    A.    The Lenders will be materially and adversely affected by the Exchange Offer. ........................................................................................... 12

    B.    Contrary to Cumulus's arguments, Section 8.16 applies to amendments to the Credit Agreement................................................................ 14

    C.    Section 8.16 can be read harmoniously with Sections 11.1, 4.24 and 4.25 to preclude Cumulus from amending the Credit Agreement ..................................................................................................... 16

II.    The Proposed Payments on the Unsecured Notes Are Restricted Payments in Violation of Section 8.8 of the Credit Agreement. .......................................................... 18

    A.    The only "refinancing" of the Unsecured Notes "permitted pursuant to the terms of" the Credit Agreement is a Permitted Refinancing. ................................................................................................ 20

        1.    Cumulus confuses mere incurrence of debt with repayment of debt. ................................................................................... 21

i

2.      The Term Loan Parties' interpretation of Section 8.8(j)(i) is
        consistent with other provisions of the Credit Agreement...................... 21

3.      Sections 8.2 and 3.2 do not support Cumulus's
        interpretation. ................................................................................. 23

4.      Cumulus's interpretation of Section 8.8(j)(i) would
        swallow the rule against making Restricted Payments on
        Unsecured Notes. .............................................................................. 24

5.      Cumulus's interpretation would eviscerate Section 8(j)(ii). .................... 25

6.      Cumulus's interpretation would allow it to avoid the
        Restricted Payments covenant. ............................................................ 26

7.      Precedent in analogous cases supports the Term Loan
        Parties' interpretation of the scope of Section 8.8(j). ............................. 26

B.      The use of proceeds from new secured Revolving Loans to repay
        Unsecured Notes is not a Permitted Refinancing. .................................. 28

1.      The Exchange Offer violates clause (ii) of the definition of
        Permitted Refinancing. ....................................................................... 29

2.      The Exchange Offer violates clause (vii) of the definition
        of Permitted Refinancing. .................................................................... 30

III.    Alternatively, Cumulus's Motion for Summary Judgment Should Be Denied to
        Permit the Parties to Take Discovery Regarding Extrinsic Evidence of the
        Meaning of Section 8.8. ................................................................................. 31

IV.     Cumulus's Motion for Summary Judgment Should be Denied for the Additional
        Reason that There Are Disputed Issues of Material Fact as to Whether the
        Exchange Offer Violates Cumulus's Implied Obligations of Good Faith and Fair
        Dealing. ...................................................................................................... 32

V.      Cumulus's Motion for Summary Judgment Regarding the Most-Favored Nation
        Clause Should Be Denied. ............................................................................. 34

CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aramony v. United Way of Am.*,
  254 F.3d 403 (2d Cir. 2001)......................................................................................24

*Bank of New York Mellon v. Realogy Corp.*,
  979 A.2d 1113 (Del. Ch. 2008).............................................................................27, 28

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*,
  361 F. Supp. 2d 283 (S.D.N.Y. 2005)........................................................................14

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*,
  2007 WL 1988150 (S.D.N.Y. July 10, 2007) ............................................................25

*Carvel Corp. v. Diversified Mgmt. Grp., Inc.*,
  930 F.2d 228 (2d Cir. 1991)........................................................................................32

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................................14

*Chase Manhattan Bank, N.A v. Keystone Distribs, Inc.*,
  873 F. Supp. 808 (S.D.N.Y. 1994) .............................................................................32

*Citibank, N.A. v. Norske Skogindustrie ASA*,
  2016 WL 1052888 (S.D.N.Y. Mar. 8, 2016) ...........................................26, 27, 28

*Constellation Power Source, Inc. v. Select Energy, Inc.*,
  467 F. Supp. 2d 187 (D. Conn. 2006), *adhered to on reconsideration*,
  2007 WL 188135 (D. Conn. Jan. 23, 2007)................................................................15

*CSI Inv. Partners II, L.P. v. Cendant Corp.*,
  507 F. Supp. 2d 384 (S.D.N.Y. 2007).........................................................................32

*ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*,
  1999 WL 777883 (S.D.N.Y. Sept. 29, 1999)..............................................................15

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
  680 F. Supp. 2d 625 (S.D.N.Y. 2010)....................................................................32, 33

*Heublein, Inc. v. United States*,
  996 F.2d 1455, 1461 (2d Cir. 1993)............................................................................10

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014)...........................................................................28

*John Wiley & Sons, Inc. v. DRK Photo*,
  998 F. Supp. 2d 262 (S.D.N.Y. 2014)................................................................9, 10

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
  424 F.3d 195 (2d Cir. 2005)................................................................................18

*Lemus v. Manhattan Car Wash, Inc.*,
  2101 WL 4968182 (S.D.N.Y Nov. 24, 2010).......................................................34

*N. River Ins. Co. v. Allstate Ins. Co.*,
  866 F. Supp. 123 (S.D.NY. 1994) .......................................................................15

*Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Monarch Payroll, Inc.*,
  2016 WL 634083 (S.D.N.Y. Feb. 17, 2016).........................................................30

*Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*,
  472 F.3d 33 (2d Cir. 2006).................................................................................31

*Pig Newton, Inc. v. Bds. Of Dirs. Of Motion Picture Indus. Pension Plan*,
  95 F. Supp. 3d 366 (S.D.N.Y. 2015)....................................................9, 18, 25, 27

*Rochdale Vill., Inc. v. Pub. Serv. Emp. Unikon, Local No. 80, Int'l Bhd. Of
  Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,
  605 F.2d 1290 (2d Cir. 1979).............................................................................15

*Schwabenbauer v. Bd. Of Educ. of Olean*,
  667 F.2d 305 (2d Cir. 1981)...............................................................................10

*Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999).................................................................33

*Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*,
  839 F. Supp. 2d 680 (S.D.NY. 2012)...................................................................16

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*
  41 F.3d 1570 (2d Cir. 1994)................................................................................32

*U.S. Naval Inst. V. Charter Commc'ns, Inc.*,
  875 F.2d 1044 (2d Cir. 1989)..............................................................................31

*Wallace v. Merrill Lynch Capital Servs, Inc.*,
  814 N.Y.S.2d 566 (Sup. Ct. NY. County 2005) ..................................................33

*Worldwide Home Prods., Inc. v. Time Inc.*,
  2013 WL 5477480 (S.D.N.Y. Sept. 30, 2013)......................................................10

**Rules**

Fed R. Civ. P. 8(d)(3)..............................................................................................33

Fed R. Civ. P. 56 .................................................................................................................9

Fed. R. Civ. P 56(d) ..........................................................................................................31

Local Rule 56.1 ...................................................................................................................3

**Other Authorities**

*Refinancing*, Black's Law Dictionary (10th ed. 2014) .................................................21

Restatement (Second) of Contracts § 203(c) .................................................................24

Defendant-intervenors and counterclaim-plaintiffs (collectively, the "Term Loan Parties") submit this memorandum of law in opposition to the motion for summary judgment filed by Cumulus Media Inc. and Cumulus Media Holdings Inc. (together, "Cumulus" or the "Company") and in support of the Term Loan Parties' cross-motion for summary judgment.

## PRELIMINARY STATEMENT

Three years ago, Cumulus incurred more than $2 billion of Term Loans secured by first priority liens on and security interests in substantially all of Cumulus's assets (the "Collateral"). In the three years since the Term Loans were made, Cumulus's financial condition has deteriorated substantially.  The Company's adjusted earnings have fallen by nearly half, while its leverage has nearly doubled.  As explained in the accompanying Declaration of Carlyn Taylor, Cumulus's enterprise value (which is the same as the value of the Collateral securing the Term Loans) has fallen to $1.449 billion – far less than the $1.810 billion in secured Term Loans presently outstanding.  Thus, Cumulus is insolvent and the Term Loans are under-collateralized by $361 million.  The distressed loan market understands this and, consequently, the Term Loans are trading at just 67 cents on the dollar.

In addition to the $1.810 billion in secured Term Loans, Cumulus also has outstanding $610 million in Unsecured Notes.  As a practical matter, these Unsecured Notes are "out of the money" because the $1.449 billion in Collateral would be applied solely towards partial repayment of the Term Loans.  There simply would be no value remaining for the holders (the "Unsecured Noteholders") of the Unsecured Notes or the under-collateralized and unpaid portion of the Term Loans.

The Credit Agreement governing the Term Loans contains various provisions that protect the first lien position of the holders (the "Term Lenders") of Term Loans – that is, ensures that the Term Lenders will be paid out before the Unsecured Noteholders.  For this reason, Section

8.8 contains a broad restriction that expressly precludes Cumulus from making any principal payments on the Unsecured Notes.  Section 8.16 further protects the Term Lenders by barring Cumulus from agreeing to make any amendment to the Credit Agreement that would materially and adversely affect the Term Lenders' interests.

To reduce its overall debt level, Cumulus has devised and proposed an improper scheme whereby the Unsecured Noteholders would exchange their $610 million of Unsecured Notes for $305 million in new secured indebtedness in the form of revolving loans plus some equity in the Company.  These revolving loans would be secured by the Collateral, *pari passu*, on equal footing with the first priority liens and security interests of the already under-collateralized Term Loans.  The addition of $305 million in new secured revolving loans to Cumulus's debt structure would thus adversely affect the Term Lenders by materially diluting their already impaired Collateral position.

Cumulus's improper scheme would have the effect of allowing the insolvent Company to transfer more than $200 million in Collateral value from the secured Term Lenders to the Unsecured Noteholders in derogation of Credit Agreement terms that explicitly provide the Term Lenders with assurances against material, adverse dilution of their first lien position in the Collateral as well as restricted payments on the Unsecured Notes.

More particularly, the proposed exchange offer violates Sections 8.8 and 8.16 of the Credit Agreement.  Summary judgment should be entered in favor of the Term Loan Parties on their Section 8.16 claim because they have submitted affirmative evidence (including the Taylor Declaration) demonstrating that Cumulus's proposed amendments to the Credit Agreement will materially and adversely affect the interests of the Lenders.  Cumulus has presented **no** evidence to the contrary.  Instead, Cumulus strains to argue that Section 8.16 does not apply to the Credit

Agreement in view of Sections 11.1, 4.24 and 4.25.  Cumulus's argument must fail, however, because the provisions of Section 8.16 can be read harmoniously with those sections.  Whereas Sections 11.1, 4.24 and 4.25 specify those Lenders whose consent is needed in order for certain types of amendments to the Credit Agreement to become effective, Section 8.16 requires that **Cumulus** itself not agree to the amendments unless it determines that such amendments do not materially and adversely affect the Lenders' interests.

Cumulus's motion for summary judgment should also be denied and the Term Loan Parties' cross-motion for summary judgment should be granted on the grounds that the proposed payments on the Unsecured Notes constitute "Restricted Payments" in violation of Section 8.8. Although Cumulus tries to argue that such Restricted Payments may be made in connection with the Company's improper refinancing of the Unsecured Notes, the only "refinancing" of the Unsecured Notes permitted under the Credit Agreement as a matter of law is a Permitted Refinancing.  The proposed transactions do not qualify as a Permitted Refinancing and Cumulus does not contend otherwise.

## STATEMENT OF FACTS[1]

### A.     Cumulus and Its Highly-Leveraged Capital Structure

Cumulus is an over-leveraged radio broadcasting company with too much debt for the earnings it generates.  SMF ¶¶ 117–18, 152–53.  Cumulus has $2.42 billion of interest-bearing liabilities, consisting of $1.810 billion in secured Term Loans and $610 million of 7.75% Unsecured Notes due 2019.  *Id.* ¶¶ 118, 119, 129, 131.

---

[1]     Citations to facts contained in the Term Loan Parties' Local Rule 56.1 statement of material facts ("SMF") incorporate the record citations therein.  Unless otherwise indicated, "Ex." refers to exhibits to the Declaration of Madlyn Gleich Primoff ("Primoff Decl.").  "Taylor Decl." refers to the declaration of Carlyn Taylor.

The Credit Agreement governs the secured Term Loans. *Id.* ¶ 120. The Term Loans are secured by first priority liens on and security interests in the Collateral, which is comprised of substantially all of Cumulus's assets. *Id.* ¶ 122. Because the Term Loans are secured by the Collateral, they bear a low interest rate of approximately 4.25% as compared with the higher 7.75% rate on the Unsecured Notes. *Id.* ¶¶ 123, 130.

The Term Loan Parties hold $579.7 million of the $1.810 billion in Term Loans. *Id.* ¶ 125. The Term Loan Parties are part of a larger ad hoc group of Term Lenders, which ad hoc group is represented by the undersigned counsel and holds $1.107 billion of Term Loans. *Id.* ¶¶ 126–27. The ad hoc group supports the Term Loan Parties' position herein. SMF ¶ 128.

In addition to the Term Loans, the Credit Agreement also provides for Cumulus to incur revolving loans ("Revolving Loans"), which would be secured by the same Collateral as the Term Loans on a *pari passu* basis (equal in rank and priority). SMF ¶¶ 132, 141–42. Certain lenders ("Revolving Lenders") have issued commitments to make Revolving Loans to Cumulus, but those commitments are presently undrawn. *Id.* ¶¶ 133–34. They may be drawn on by Cumulus only if Cumulus either satisfies various draw-down conditions set forth in the Credit Agreement or obtains a waiver of these conditions from Majority Revolving Lenders, *i.e.*, the holders of more than 50% of the revolving credit commitments. *Id.* ¶ 136.

Among the conditions that must be satisfied in order for Cumulus to draw down on the revolving credit commitments is the requirement, pursuant to Section 8.1 of the Credit Agreement, that the Company's "Consolidated First Lien Net Leverage Ratio" – which is, essentially, the amount of the Company's first lien secured debt divided by its EBITDA[2] – be less than certain specified levels. *Id.* ¶¶ 135–36. The specified required leverage ratio under

---

[2]   "EBITDA" refers to earnings before interest, taxes, depreciation, and amortization.

Section 8.1 is currently 5:1.  *Id.* ¶¶ 137–38.  Cumulus's Consolidated First Lien Net Leverage

Ratio is presently 8.5:1 (the first lien debt is 8.5 times EBITDA) (Taylor Decl. ¶¶ 15, 21), well in

excess of the required 5:1, and therefore Cumulus cannot draw down on the revolving credit

commitments.  SMF ¶¶ 138–39.  While the Consolidated First Lien Net Leverage Ratio

limitation may be waived by Majority Revolving Lenders, no rational Revolving Lender would

lend money to Cumulus at 100 cents on the dollar only to have its loan trade at 67 cents on the

dollar or less.  *Id.* ¶ 155.

**B.    The Term Loans Are Underwater and the Unsecured Notes Are Out of the Money**

As set forth in the Taylor Declaration, Cumulus is financially distressed.  Cumulus's

EBITDA has declined dramatically from when the Term Loans were made three years ago –

falling from $416 million annually as of the third quarter of 2013 to only $212 million annually

as of the third quarter of 2016, an almost 49% decline.  SMF ¶¶ 144, 147; *see also* Taylor Decl.

¶¶ 20–21.  Over the same time period, Cumulus's total debt leverage – the ratio of its total debt

to its EBITDA – has nearly doubled from 6.3 as of September 2013 to 11.4 as of September

2016.  SMF ¶¶ 145, 148.  Furthermore, Cumulus's secured debt leverage – the ratio of its

secured debt to its EBITDA – has also nearly doubled, from 4.9 to 8.5 over the same time period.

SMF ¶¶ 146, 149.

Cumulus's enterprise value (including the value of the Collateral securing the Term

Loans) is $1.449 billion, an amount that is materially less than the $1.810 billion principal

amount of Term Loans outstanding.  SMF ¶¶ 152–53; Taylor Decl. ¶¶ 8, 25–45.  Thus, the Term

Loans are under-collateralized by $361 million and face a potential recovery of only 80 cents on

each dollar of Term Loan outstanding.  SMF ¶¶ 153–54.  The fact that the Term Loans are

under-collateralized is reflected in the current trading price of the Term Loans, which was

approximately 67 cents over the last 30 trading days, substantially below par of 100 cents.  SMF

¶ 155.

Given that the enterprise value of Cumulus is far less than the outstanding principal amount of the Term Loans, the Unsecured Notes are completely "out of the money" as a practical matter, because the $1.449 billion in Collateral would be applied solely towards partial repayment of the Term Loans and there simply would be no value remaining for the Unsecured Noteholders or for the under-collateralized portion of the Term Loans.

## C.     Cumulus and Certain Unsecured Noteholders Devise an Improper Exchange Offer

In March 2016, Cumulus disclosed that it had proposed an exchange offer to the Unsecured Noteholders.  SMF ¶ 159.  Credit market analysts did not view Cumulus's announcement of the March 2016 potential exchange offer favorably.  S&P, for example, stated that it considered the potential exchange offer to be a distressed transaction and "tantamount to a default." *Id* . ¶ 160.  It lowered its corporate credit ratings on Cumulus from a "B-" to "CCC." *Id*. ¶ 161.  S&P assigned a recovery rating of "3" to the Term Loans, meaning that it expects the Term Lenders' recovery on principal amount to be in the range of 50–70%. *Id* . ¶ 164.  S&P also assigned a recovery rating of "6" to the Unsecured Notes, meaning that it expects their recovery on principal amount to be in the range of 0–10%. *Id*. ¶ 165.  Moody's Investor Services took a similarly negative view, joining S&P in downgrading Cumulus' ratings. *Id*. ¶¶ 166–68.

Negotiations between Cumulus and certain Unsecured Noteholders continued in the fall of 2016, culminating in the exchange offer at issue in this litigation (the "Exchange Offer"). *Id*. ¶ 169.  On December 6, 2016, Cumulus announced that it had entered into a refinancing support agreement ("RSA") with certain supporting Unsecured Noteholders holding $349.7 million (or approximately 57.3%) of the Unsecured Notes outstanding. *Id*. ¶¶ 170–71.  Pursuant to the Exchange Offer, Unsecured Noteholders would receive 50 cents in secured Revolving Loans for each dollar in Unsecured Notes tendered plus some equity in the Company. *Id*. ¶ 183.  Cumulus

admits that several steps are required in order for this exchange to occur.

First, existing Revolving Lenders must assign their revolving credit commitments to the participating Unsecured Noteholders (or a trust), who would become the "New Revolving Lenders." SMF ¶ 172.

Second, Cumulus proposes to make two amendments to the Credit Agreement. *Id.* ¶ 174. The first of these amendments would modify the terms of the Company's existing Revolving Credit Facility by, among other things:

- increasing the interest rate with respect to the Revolving Loans to an exorbitant 14.25% (including a LIBOR floor of 1%);

- extending the Revolving Credit Facility's maturity date to November 23, 2020;

- modifying the financial maintenance covenant in Section 8.1 to permit Cumulus to draw on the Revolving Credit Facility at its current leverage ratio; and,

- upon completion of the refinancing of the Unsecured Notes tendered in the exchange, eliminating the financial maintenance covenant under the Revolving Credit Facility.

*Id.* ¶¶ 175–78. The second of these amendments would provide for an "Incremental Revolving Facility" that would allow Cumulus to incur an additional $105 million in Revolving Loans beyond the $200 million presently permitted. *Id.* ¶ 179.

Third, Cumulus would draw on the $305 million in Revolving Loans to be held by the participating Unsecured Noteholders or the trust, and use the proceeds of the draw to repay the $610 million of Unsecured Notes at 50 cents on the dollar plus some equity. *Id.* ¶ 183. Cumulus does not dispute that if the Exchange Offer were consummated, the Unsecured Noteholders would receive Revolving Loans that would be secured on a *pari passu* basis with the same Collateral that secures the Term Loans. *Id.* ¶¶ 190–92. Because the Term Loans are already under-collateralized and underwater (*see* pp. 5–6, *supra*), the Exchange Offer would thus further impair and dilute the Term Lenders' collateral position. SMF ¶¶ 190, 194–97.

As set forth in the Taylor Declaration, the consummation of the Exchange Offer and the sharing of the Collateral by the Term Loans and the new Revolving Loans would reduce the expected recovery on the Term Loans from 80% of the Term Loans' principal amount to only 68.5%.[3]  SMF ¶ 194.  The Collateral deficiency for the Term Lenders would increase from $361 million to $570 million.  SMF ¶ 195.  In effect, the proposed exchange would transfer $209 million of value from the secured Term Lenders to the Unsecured Noteholders.  *Id.* ¶ 199.

It is a condition precedent to the consummation of the Exchange Offer that either (a) holders of at least 95% of the principal amount of the Unsecured Notes agree to the Exchange Offer and tender their Unsecured Notes, or (b) Cumulus and the supporting Unsecured Note-holders waive that condition.  *Id*. ¶ 182.  On January 11, 2017, Cumulus announced that it had extended the expiration date of the Exchange Offer to March 13, 2017.  *Id.* ¶ 187.  Cumulus has submitted no evidence that the requisite 95% of Unsecured Noteholders have agreed to the Exchange Offer or that Cumulus and the supporting Unsecured Noteholders have waived the condition.  Indeed, as of January 11, 2017, Cumulus admitted that only 70.7% of the outstanding Unsecured Notes have been tendered.  *Id.* ¶ 185.

### D.   The Credit Market Analysts React Unfavorably to the Announcement of the Exchange Offer

Following Cumulus's announcement of the Exchange Offer, credit market analysts continued to take a dim view of the proposed transaction.  S&P again lowered Cumulus's corporate credit rating – this time from "CCC" to "CC " – reiterating that it viewed the Exchange Offer as a distressed transaction and "tantamount to a default."  SMF ¶ 202.[4]  S&P observed that, if the transaction were to occur, it would still consider Cumulus's capital structure to be

---

[3]   Further details regarding these calculations are discussed at p. 12 below.

[4]   A rating of CC means that S&P "expects default to be a virtual certainty."  Taylor Decl. ¶ 14.

unsustainable and that S&P's "negative rating outlook reflects the possibility that [it] would lower [its] corporate credit rating on [Cumulus] to 'SD' (selective default) after the exchange is completed." *Id.* ¶ 203.

### E.    Overview of the Credit Agreement

The Credit Agreement contains a number of provisions designed to protect the first lien position and the Collateral value of the Term Lenders.   Section 7 contains eight pages of affirmative covenants (*i.e.*, what Cumulus must do) and Section 8 contains 18 pages of negative covenants (*i.e.*, what Cumulus shall not do).   Among other things, the negative covenants in Section 8 prevent Cumulus from incurring new indebtedness, incurring new liens and making payments on the Unsecured Notes unless specific exceptions apply.   The parties' dispute centers around the negative covenants in Sections 8.8 and 8.16.

Section 8.8 prohibits Cumulus from making prepayments on the Unsecured Notes unless, pursuant to Section 8.8(j)(i), the prepayments are accomplished through a Permitted Refinancing; or, pursuant to Section 8.8(j)(ii), Cumulus's Consolidated First Lien Net Leverage Ratio is less than or equal to 4:1.   Ex. 1§ 8.8(j).

Section 8.16 prevents Cumulus from agreeing to the proposed amendments to the Credit Agreement if those amendments will materially and adversely affect the interests of the Lenders. *See* Ex. 1 § 8.16.

### LEGAL STANDARD

The standard for summary judgment under Federal Rule of Civil Procedure 56 is well known.  *See, e.g.*, *Pig Newton, Inc. v. Bds. of Dirs. of Motion Picture Indus. Pension Plan*, 95 F. Supp. 3d 366, 373–75 (S.D.N.Y. 2015) (Failla, J.); *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 274–75 (S.D.N.Y. 2014) (Failla, J.).   Where, as here, both parties have moved for summary judgment, the standard used to decide the cross-motions "'is the same as that for

individual summary judgment motions[,] and a court must consider each motion independent of the other.'" *John Wiley & Sons*, 998 F. Supp. 2d at 275 (quoting *Worldwide Home Prods., Inc. v. Time Inc.*, 2013 WL 5477480, at *6 (S.D.N.Y. Sept. 30, 2013)).  Moreover, the Court need not "grant judgment as a matter of law for one side or the other," but "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  Finally, neither side is barred from asserting that there are issues of fact sufficient to preclude the entry of summary judgment against it.  *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir. 1981).

## ARGUMENT

Cumulus's motion for summary judgment is readily disposed of by reference to Section 8.16, which requires Cumulus to demonstrate that its proposed amendments to the Credit Agreement do not in any material respect adversely affect the interests of the Lenders.  Whereas Cumulus reads Section 8.16 as being trumped by various provisions of the Credit Agreement, Section 8.16 can easily be read in concert with those provisions and, therefore, Cumulus's position is incorrect as a matter of law.  Moreover, the Term Loan Parties have shown that the proposed amendments to the Credit Agreement will materially and adversely affect the interests of the Lenders in violation of Section 8.16.  Because Cumulus has failed to put forward sufficient evidence to rebut this showing, the Term Loan Parties' cross-motion for summary judgment should be granted.

Cumulus's motion also should be denied and the Term Loan Parties' cross-motion granted because Cumulus's proposed payments on the Unsecured Notes in connection with the

Exchange Offer violates the Restricted Payments covenant in Section 8.8 as a matter of law.[5]

Alternatively, to the extent that the Court finds that the parties have offered two reasonable inter-

pretations of Section 8.8, both parties' motions should be denied and discovery should proceed.

**I.**   **CUMULUS'S PROPOSED AMENDMENTS TO THE CREDIT AGREEMENT VIOLATE SECTION 8.16 OF THE CREDIT AGREEMENT BECAUSE THEY MATERIALLY AND ADVERSELY AFFECT THE INTERESTS OF THE LENDERS**

Section 8.16 bars Cumulus from agreeing to any material amendment or other change to:

> (b) any … credit agreement or other document entered into to evidence or govern the terms of any Indebtedness … permitted to be created, incurred, or assumed pursuant to subsection 8.2 … except for any such amendment, modification or waiver that, (i) would not, in any material respect, adversely affect the interests of the Lenders ….

Ex. 1 § 8.16; *see also id.* § 8.2.  As set forth below, Cumulus's proposed amendments to the

Credit Agreement violate Section 8.16 because they do materially and "adversely affect" the

interests of the Lenders.

---

[5]   Recognizing that the Exchange Offer violates the contractual provisions contained in Sections 8.8 and 8.16 of the Credit Agreement, Cumulus relies on equity to argue that, notwithstanding the express provisions of the Credit Agreement, Cumulus should be able to pay down the Unsecured Notes in order to postpone the maturity date of the Term Loans.  *See* Pl. Mem. 3.   Cumulus's appeal to equity is misplaced because there are specific contractual provisions that prohibit Cumulus from using the proceeds of secured Revolving Loans to prepay Unsecured Notes.   Moreover, Cumulus's equity argument is utterly devoid of merit for the following reasons.  When the Term Loans were incurred, the Unsecured Notes were already outstanding and had a maturity date of May 1, 2019.  The parties to the Credit Agreement agreed that the Term Loans would have a maturity date of December 23, 2020 (*i.e.*, after the maturity of the Unsecured Notes); but, they also expressly agreed that if Cumulus still has at least $200 million in Unsecured Notes outstanding as of January 30, 2019, then the Term Loan maturity date shall be January 30, 2019.  Under the Credit Agreement, Cumulus may *legitimately* avoid the earlier Term Loan maturity date in a number of ways.  For example, it could refinance the Unsecured Notes through a Permitted Refinancing (Section 8.8(j)(i)), prepay the Unsecured Notes if Cumulus satisfied the applicable leverage ratio (Section 8.8(j)(ii)), issue stock and use the proceeds of such issuance to pay the Unsecured Notes (Section 8.8(h)), or convert the Unsecured Notes to equity in the Company (Section 8.8(i)).  But, what Cumulus may not do is what it has proposed here:  an inequitable scheme to deprive the Term Lenders of the earlier maturity date that was part of their bargain.

### A.    The Lenders will be materially and adversely affected by the Exchange Offer.

While first lien term loans are designed to be a low risk form of financing, with an ample cushion of value above the face amount of the term loans to assure repayment, Cumulus's dramatic earnings declines in the three years since the Term Loans were incurred have created a situation not only where Cumulus is insolvent, but also where the Term Loans are materially under-collateralized.  *See* Taylor Decl. ¶¶ 20–21, 25–45.

Cumulus's enterprise value of $1.449 billion is less than the outstanding Term Loan balance of $1.810 billion by more than $360 million dollars, which means that the Term Lenders can expect to recover only 80 cents on each dollar of their Term Loans.  SMF ¶¶ 152–54. Because the Term Lenders are materially under-collateralized, the Unsecured Notes are, as a practical matter, "out of the money."  Indeed, after the Collateral is applied towards the repayment of the secured Term Loans, there simply will be no value left for the Unsecured Notes or for the under-collateralized portion of the Term Loans.

The transactions contemplated by the Exchange Offer would result in the transfer of $209 million in value from the Term Lenders to the Unsecured Noteholders.  *Id.* ¶ 199.  Indeed, Cumulus admits that the Exchange Offer provides for the Unsecured Notes to be replaced by new Revolving Loans that would be secured by the same Collateral that secures the Term Loans and on a *pari passu* basis, thus diluting the Term Lenders' already under-collateralized position. *Id.* ¶¶ 190–92.  If the Exchange Offer were consummated, the $1.810 billion of Term Loans secured by approximately $1.449 billion of Collateral (for a pre-exchange recovery level of 80%) would become $2.115 billion of combined Term Loans and new Revolving Loans secured by the same $1.449 billion of Collateral.  *Id.* ¶¶ 154, 193–94.  On account of their $305 million in new Revolving Loans out of total secured indebtedness of $2.115 billion, the Unsecured Noteholders would be entitled to 14.4% (*i.e.*, $305 million divided by $2.115 billion) of Cumulus's $1.449

billion in enterprise value – or $209 million.  *Id.* ¶¶ 198–99.  The Term Lenders' collateral position would be diluted by the $305 million in new Revolving Loans held by the Unsecured Noteholders.  *Id.* ¶¶ 190–98.  Consequently, the Term Lenders would recover only 85.6% of the $1.449 billion in enterprise value (or $1.240 billion).  *Id.* ¶ 196.  This $1.240 billion represents a recovery on the Term Loans of only 68.5%.  *Id.* ¶ 197.  The difference between the 80% recovery and the 68.5% recovery on the Term Loans is a $209 million loss in value.  *Id.* ¶¶ 194, 199.[6]

Furthermore, the Exchange Offer materially affects Cumulus's ability to refinance the secured Term Loans.  As a result of the Exchange Offer, Cumulus would have $2.115 billion of secured debt rather than $1.810 billion of secured debt, which "materially worsens its ability to refinance the Term Loans" and "a refinancing of the Term Loans becomes even more impossible."  Taylor Decl. ¶¶ 15–17.

The foregoing demonstrates that the proposed Exchange Offer involves a clearly insolvent company rearranging its balance sheet at the expense of the Term Lenders.  The addition of more indebtedness to the first lien position is a direct transfer of more than $200 million of Cumulus's value from the Term Lenders to the Unsecured Noteholders.  *Id.* ¶¶ 9, 18.  No new value or additional liquidity is being created by the exchange.  *Id.* ¶ 7.

Cumulus asserts that its proposed amendments do not adversely affect the "Lenders" because the term "Lenders" is defined to include both Term Lenders and Revolving Lenders.  Pl. Mem. 20.   Contrary to Cumulus's assertions, the proposed amendments do materially and

---

[6]     Cumulus argues that under the Term Lender Parties' interpretation of Section 8.16, the Company could never amend the Credit Agreement to add an Incremental Facility.  Pl. Mem. 19.  Not so.  If the value of the Collateral securing the Term Loans were adequate, then the amendment would not materially and adversely affect the Lenders' interests.  But, here, the Collateral coverage is woefully inadequate.

adversely affect the Lenders for several reasons.

- First, even after the incurrence of the $305 million in new Revolving Loans, the Term Lenders still own **85.6%** of the secured debt.  SMF ¶ 196.

- Second, the Exchange Offer contemplates the incurrence of $305 million in new Revolving Loans that simply do not exist today and do not share in the Term Lenders' Collateral today.  Thus, the Revolving Lenders' loan exposure would increase from $0 to $305 million following the consummation of the Exchange Offer without any concomitant additional cash for the Company.

- Third, given that the Term Lenders and the Revolving Lenders share *pari passu* in the Collateral, all of the Lenders will recover only 68.5% of the face amount of their Term Loans or Revolving Loans, as the case may be.  *Id*. ¶ 192.  That elimination of value has a material and adverse effect on the Revolving Lenders as Revolving Lenders.

- Fourth, the fact that Unsecured Noteholders are allegedly benefited in their capacity as Unsecured Noteholders is entirely irrelevant.  Section 8.16 is designed to protect the Lenders – not Unsecured Noteholders – against the adverse amendments to the Credit Agreement.

The Term Loan Parties have submitted affirmative evidence that Cumulus's proposed amendments to the Credit Agreement will materially and adversely affect the interests of the Lenders.  Cumulus has not submitted any evidence sufficient to raise a triable issue of fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Accordingly, the Term Loan Parties respectfully request that the Court grant summary judgment in their favor.

Even if Cumulus were to submit evidence opposing the Term Loan Parties' showings of adversity and materiality, the issue should be resolved at trial.  *See, e.g.*, *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 295–96 (S.D.N.Y. 2005) ("[C]ourts and commentators have long recognized that materiality is primarily a question of fact . . . .").

**B.**    **Contrary to Cumulus's arguments, Section 8.16 applies to amendments to the Credit Agreement.**

Section 8.16 expressly applies, among other things, to amendments or changes to "***any*** indenture, ***credit agreement*** or other document entered into to evidence or govern the terms of

14

any Indebtedness … permitted to be created, incurred or assumed pursuant to subsection 8.2." Ex. 1 § 8.16 (emphasis added).  The Credit Agreement is plainly a "credit agreement" and it governs the Term Loans as well Revolving Loans, each of which is "Indebtedness" "permitted to be created, incurred or assumed pursuant to subsection 8.2."  *See id.* §§ 1.1 (defining "Indebtedness" to include "all indebtedness … for borrowed money"), 8.2(a) (permitting Cumulus to incur "Indebtedness of the Loan Parties under this Agreement").  Thus, the Credit Agreement falls squarely within the plain and natural meaning of Section 8.16.

Nevertheless, Cumulus urges this court to reach the illogical conclusion that the language "any … credit agreement" somehow does not include ***the*** Credit Agreement, but rather only "other agreements that evidence other debts."  Pl. Mem. 15 (emphasis removed).  Cumulus's argument is not a permissible reading of Section 8.16 based on both the plain language of the provision as well as the applicable case law.

"The use of the term 'any' makes it clear that the parties intended the clause to be broad." *N. River Ins. Co. v. Allstate Ins. Co.*, 866 F. Supp. 123, 127 (S.D.N.Y. 1994); *accord Rochdale Vill., Inc. v. Pub. Serv. Emp. Union, Local No. 80, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 605 F.2d 1290, 1296 (2d Cir. 1979) (describing the phrase "any and all disputes" as "all-inclusive"); *ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*, 1999 WL 777883, at *2 (S.D.N.Y. Sept. 29, 1999) (describing policy covering "any consequential loss or damage" as reading "in the broadest possible terms").  Moreover, "any" is "not a word of limitation, but is an all-encompassing term, and sophisticated contracting parties know that." *Constellation Power Source, Inc. v. Select Energy, Inc.*, 467 F. Supp. 2d 187, 205 (D. Conn. 2006) (applying New York law), *adhered to on reconsideration*, 2007 WL 188135 (D. Conn. Jan. 23, 2007).  Thus, when Section 8.16 refers to "any … credit agreement," it plainly

includes the Credit Agreement.

The cases cited by Cumulus are inapposite and certainly do not support a different reading of Section 8.16.  *See* Pl. Mem. 15–16.  Cumulus's argument is akin to the argument rejected by the Court in *Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*, 839 F. Supp. 2d 680 (S.D.N.Y. 2012), a case cited by Cumulus.  Pl. Mem. 16.  In *Sunbelt*, the plaintiff was trying to limit liability under the agreement by reading in the more restrictive defined term "Equipment" instead of the broader "equipment."  839 F. Supp. 2d at 688.  The court concluded that it would be illogical to conclude that the use of "equipment" in the disputed provision could be read to have meant only "Equipment."  *Id.* at 688–89.  Here, Cumulus is advocating for a more restrictive reading of the term "credit agreement" when Section 8.16 was plainly drafted to include amendments to this Credit Agreement.

Finally, based on principles of contract interpretation, if the generic term "any … credit agreement" were meant to exclude *the* Credit Agreement, then Section 8.16 would have been drafted to include such a carve-out.  But no such carve-out was drafted into Section 8.16 and the Court should not read such a carve-out into Section 8.16 when one does not exist.

**C.     Section 8.16 can be read harmoniously with Sections 11.1, 4.24 and 4.25 to preclude Cumulus from amending the Credit Agreement**

Even though Section 8.16 can easily be read in concert with all of the other provisions of the Credit Agreement, Cumulus takes the position that Section 8.16 is not implicated in this dispute – and should, in effect, be read out of the Credit Agreement – because it is overridden by Sections 11.1, 4.24 and 4.25.  Pl. Mem. 17–20.  But Sections 11.1, 4.24 and 4.25 neither override Section 8.16 nor conflict with Section 8.16; indeed, Section 8.16 can be read in harmony with these other provisions.

Sections 11.1(e), 4.24 and 4.25 specify which types of Lenders (*e.g.*, Term Lenders,

Revolving Lenders, or Required Lenders)[7] must consent in order for an action or amendment under the Credit Agreement to become effective, and what margins of approval (*e.g.*, all, majority, or each) are necessary to garner the applicable Lenders' consent.  Section 8.16, by contrast, makes no attempt whatsoever to grant the Term Lenders a consent right when the Credit Agreement does not otherwise provide for one.  Rather, the negative covenant in Section 8.16 simply provides that **Cumulus** (not the Term Lenders) shall not agree to the proposed amendments to the Credit Agreement unless those amendments "would not, in any material respect, adversely affect the interests of the Lenders …."  Ex. 1 § 8.16.  Section 8.16 thus speaks to what Cumulus may not agree to – not whether the Term Lenders have a separate consent right or not.  Cumulus improperly conflates these two very separate issues.

More specifically, Section 11.1 of the Credit Agreement ("Amendments and Waivers") generally provides, subject to certain exceptions, that amendments to the Credit Agreement require the consent of Cumulus and a group of "Required Lenders."  Ex. 1 § 11.1.  It further provides that any amendment to Section 8.1 (which sets forth the leverage ratios that must be met for a draw on the Revolving Credit Facility) or any other provision that has been added to the Credit Agreement solely for the benefit of the Revolving Credit Facility requires the written consent of Cumulus and a majority of the Revolving Lenders.  *Id.*  Section 4.24 of the Credit Agreement ("Extension of Term Loans and Revolving Credit Commitments") permits Cumulus and individual Lenders to agree to maturity extensions, price amendments, and fee amendments.  Likewise, Section 4.25 establishes the specific conditions for Incremental Facility Amendments and states that only the Lenders providing the funds or commitments for the Incremental Revolving Facility need to consent.

---

[7]   The term "Required Lenders" is defined as Lenders holding more than 50% of outstanding Term Loans, Revolving Loans, and certain other types of loans.  Ex. 1 § 1.1.

Section 8.16 does not conflict with these provisions. It says nothing about which Lenders' approval is required under Section 4.24, 4.25 and 11.1 or whether the Term Lenders have any approval rights whatsoever. Rather, Section 8.16 is a negative covenant that imposes separate and independent limitations on **Cumulus's** ability to amend the Credit Agreement. It obligates **Cumulus not** to agree to amendments to the Credit agreement unless an objective determination has been made as to whether the Lenders will be materially and adversely affected by those amendments.

Nothing in Sections 11.1(e), 4.24, or 4.25 suggests that these provisions override the plain language of Section 8.16. As a general rule, "[i]n interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quotations omitted). "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible." *Id.* (quotations omitted); *see also Pig Newton*, 95 F. Supp. 3d at 382–83 (rejecting party's interpretation of contract provisions that "would require the Court to discard pages from each of the Trust Agreements, and could very easily cast doubt upon the validity of many other parts of the Trust Agreements"). If the drafters of the Credit Agreement meant for Sections 11.1, 4.24 and 4.25 to eviscerate the Term Lenders' rights under Section 8.16, they would have made it clear in each of these sections (*e.g.*, by explicitly overriding Cumulus's obligations under Section 8.16) – which they did not do.

## II. THE PROPOSED PAYMENTS ON THE UNSECURED NOTES ARE RESTRICTED PAYMENTS IN VIOLATION OF SECTION 8.8 OF THE CREDIT AGREEMENT.

Cumulus's motion should be denied, and the Term Loan Parties' cross-motion granted, because the payments on the Unsecured Notes contemplated by the Exchange Offer are

Restricted Payments in violation of Section 8.8 of the Credit Agreement. The negative covenant contained in Section 8.8 of the Credit Agreement, entitled "Limitation on Restricted Payments," restricts Cumulus from making the proposed prepayments on the Unsecured Notes. Under Section 8.8, Cumulus shall not:

> make any optional payment or prepayment on the principal of the [Unsecured] Notes or any Permitted Refinancing of the [Unsecured] Notes or redeem or otherwise acquire, purchase or defease any [Unsecured] Notes or any Permitted Refinancing thereof (all of the foregoing being referred to herein as "Restricted Payments") ….

Ex. 1 § 8.8. This prohibition on making Restricted Payments is subject to various exceptions set forth in subsections (a) through (l) of Section 8, but **none** of these exceptions allow Cumulus to use proceeds from new Revolving Loans to make payments on Unsecured Notes.

Nevertheless, Cumulus attempts to rely on Section 8.8(j), which provides:

> [Cumulus] may make payments in respect of the [Unsecured] Notes and any Permitted Refinancing thereof (i) in connection with any refinancing of the [Unsecured] Notes or any Permitted Refinancing thereof permitted pursuant to the terms hereof or (ii) so long as (x) no Default or Event of Default then exists or would result therefrom and (y) as of the date of such payment, the Consolidated First Lien Net Leverage Ratio … is less than or equal to 4.00 to 1.00.

*Id.* § 8.8(j) (underlining added). Importantly, both Cumulus and the Term Loan Parties agree that the underlined references in Section 8.8(j) to "the [Unsecured] Notes and any Permitted Refinancing thereof" should be read to refer to a single bucket of indebtedness, consisting of either the Unsecured Notes or, if they have been refinanced pursuant to a Permitted Refinancing, the indebtedness resulting from that Permitted Refinancing. Pl. Mem. 12 n.9. In other words, the parties intended that the limitation in Section 8.8 would apply to payments on the Unsecured Notes and debt used to refinance the Unsecured Notes by means of a Permitted Refinancing.

The parties also agree that Cumulus may prepay the Unsecured Notes only if the

transaction falls within one of the two exceptions in Section 8.8(j).  Pl. Mem. 7–9.  Turning to the second exception first, clause (ii) of Section 8.8(j) allows Cumulus to make payments on the Unsecured Notes when the Consolidated First Lien Net Leverage Ratio is 4:1 or less, so long as no "Default" or "Event of Default" exists under the Credit Agreement or would result from the payment.  *Id.*  In other words, if Cumulus were in a sufficiently healthy financial position, which the Credit Agreement defined to mean first lien leverage of 4:1 or less, then Cumulus would be permitted to make payments on the Unsecured Notes.  Cumulus concedes, however, that it cannot meet this exception because it does not come close to satisfying the 4:1 Consolidated First Lien Net Leverage Ratio.  SMF ¶ 138.

The first exception, clause (i) of Section 8.8(j), allows Cumulus to make payments on the Unsecured Notes "in connection with any refinancing … permitted pursuant to the terms hereof." Ex. 1 § 8.8(j).  The dispute before this Court centers around the meaning of this quoted language. As explained below, Cumulus's argument that the language would permit a refinancing of the Unsecured Notes with new secured Revolving Loans must fail because such a refinancing is plainly not a refinancing of the Unsecured Notes permitted under the terms of the Credit Agreement.  Indeed, as discussed more fully below, the only refinancing of the Unsecured Notes permitted under the Credit Agreement is a Permitted Refinancing.  Because the transactions contemplated by the Exchange Offer do not qualify as a Permitted Refinancing, Cumulus cannot invoke clause (i) of Section 8.8(j) to make payments on the Unsecured Notes.

### A.   The only "refinancing" of the Unsecured Notes "permitted pursuant to the terms of" the Credit Agreement is a Permitted Refinancing.

Cumulus concedes that the term "refinancing" in clause (i) of Section 8.8(j) is limited by the phrase "permitted pursuant to the terms hereof."  Ex. 1 § 8.8(j); *see* Pl. Mem. 10.  The Term Loan Parties respectfully submit that the only "refinancing" of the Unsecured Notes permitted

pursuant to the terms of the Credit Agreement is a Permitted Refinancing (which the Exchange

Offer transactions are not for the reasons discussed below in Section II.B).

### 1. Cumulus confuses mere incurrence of debt with repayment of debt.

As Cumulus acknowledges, a "refinancing" involves two components; namely, the

incurrence of a new debt and the repayment of an old debt.   *See* Pl. Mem. 9 (quoting

*Refinancing*, Black's Law Dictionary (10th ed. 2014) (defining refinancing as "[a]n exchange of

old debt for a new debt, as by … ***repaying*** the existing loan with money acquired from a new

loan") (emphasis added)).   Under the Credit Agreement, separate negative covenants address the

incurrence of debt and the prepayment of Unsecured Notes with the proceeds of that debt.   More

specifically, Section 8.2, which is entitled "Indebtedness," precludes Cumulus from incurring

debt, subject to certain exceptions specified therein, while Section 8.8 contains the negative

covenant limiting Cumulus from making Restricted Payments.   Therefore, when Section 8.8(j)(i)

refers to a refinancing permitted under the terms of the Credit Agreement, it is necessarily

referring not only to provisions allowing for the incurrence of debt, but also to provisions

allowing for prepayment of the Unsecured Notes with the proceeds of that debt.

Thus, even if Cumulus could incur new secured Revolving Loans (which it cannot based

on Section 8.16), the mere ability to incur that indebtedness in no way suggests that Cumulus can

use the proceeds of the incurrence to pay down the Unsecured Notes in violation of the separate

Restricted Payments covenant set forth in Section 8.8.

### 2. The Term Loan Parties' interpretation of Section 8.8(j)(i) is consistent with other provisions of the Credit Agreement.

Various provisions of the Credit Agreement confirm that the only refinancing of the

Unsecured Notes permitted pursuant to the terms of the Credit Agreement is a Permitted

Refinancing.   Significantly, Section 8.2(h) allows Cumulus to incur "Indebtedness of the

Borrower in respect of the [Unsecured] Notes … and any Permitted Refinancing thereof."  Ex. 1 § 8.2(h).  The fact that this specific provision relating to the incurrence of the Unsecured Notes refers solely and exclusively to a "Permitted Refinancing" (and no other type of "refinancing") of the Unsecured Notes is ***strong evidence*** that the parties intended that the only permissible refinancing of the Unsecured Notes is a Permitted Refinancing.

Similarly, other provisions throughout the Credit Agreement refer to the Unsecured Notes coupled with a reference to "any Permitted Refinancing thereof":

- Section 7.10(a) requires certain new subsidiaries of Cumulus to become parties to a separate agreement if they guarantee an obligation in respect of the Unsecured Notes "or any Permitted Refinancing thereof."

- Section 8.4(g) allows Cumulus to guarantee its obligations under the Unsecured Notes "and any Permitted Refinancing thereof."

- Section 8.8(h) allows Cumulus to prepay or redeem the Unsecured Notes "or any Permitted Refinancing thereof" with cash raised from the sale of capital stock in certain circumstances.

- Section 8.8(i) allows Cumulus to convert the Unsecured Notes "or any Permitted Refinancing thereof" to capital stock.

- Section 8.8(l) allows Cumulus to make payments on the Unsecured Notes or "any Permitted Refinancing thereof" up to the amount of any prepayments on the Term Loans that were declined by the Term Lenders.

- Section 8.12 prohibits Cumulus from entering into agreements to limit its ability to incur liens, except with respect to agreements governing the Unsecured Notes or a "Permitted Refinancing in respect of … the [Unsecured] Notes."

- Section 8.13 prohibits Cumulus from agreeing to any restrictions on its ability to transfer assets, except for restrictions existing under the Unsecured Notes "or any agreement governing any Permitted Refinancing in respect of the … [Unsecured] Notes."

Ex. 1.  Because the only type of refinancing that the Credit Agreement mentions concerning the Unsecured Notes is a Permitted Refinancing, it follows that a Permitted Refinancing is the sole and exclusive refinancing of the Unsecured Notes permitted under the Credit Agreement.

By contrast, none of the provisions highlighted by Cumulus (Pl. Mem. 12–13) relate specifically to the Unsecured Notes.  *See* Ex. 1 § 4.5(c) (referring to a "refinancing" of the "Facilities," meaning the Secured Term Loan Facility or the Revolving Credit Facility — not the Unsecured Notes); *id.* § 8.2(e) (referring generally to "any extension or renewals or refinancing" of any Indebtedness listed on Schedule 8.2, which **excludes** the Unsecured Notes)[8]; *id.* §§ 8.12, 8.13 (using the term "refinancing agreement" to refer to either the "Loans" or the Unsecured Notes, but also specifically referencing "Permitted Refinancing" in connection with the Unsecured Notes); *id.* § 8.15 (containing a provision parallel to Section 8.8 restricting payments on Subordinated Indebtedness except for any "refinancing of Subordinated Indebtedness permitted pursuant to the terms hereof").

### 3.    Sections 8.2 and 3.2 do not support Cumulus's interpretation.

Although Cumulus argues that nothing in the Credit Agreement's 18 pages of negative covenants precludes it from using new secured Revolving Loans to refinance the Unsecured Notes (Pl. Mem. 10), Section 8.8 does exactly that.  It unambiguously precludes Cumulus from making any prepayments on the Unsecured Notes unless the prepayment is made in connection with a refinancing permitted under the terms of the Credit Agreement.  Cumulus has failed to identify any such financing.  Ex. 1 § 8.8(j).

The plain language of Section 8.8(j)(i) places an affirmative burden on Cumulus to identify some particular provision of the Credit Agreement that expressly "permit[s]" the refinancing of Unsecured Notes with new secured Revolving Loans and the use of new secured Revolving Loan proceeds to repay Unsecured Notes.  Ex. 1.  Cumulus has not met that burden

---

[8]    In any event, the language Cumulus relies on in Section 8.2(e) would be superseded by the far more specific language in Section 8.2(h) regarding Permitted Refinancing of the Unsecured Notes.

because it has not (nor can it) identify any provision of the Credit Agreement that permits the proposed transaction.

Cumulus argues that Section 8.2 of the Credit Agreement permits Cumulus to incur indebtedness in connection with the Revolving Credit Facility and Incremental Revolving Facilities. *See* Pl. Mem. 10–11. That might be true (but for Section 8.16); however, it does not advance Cumulus's position because, as explained above, the incurrence of debt and the repayment of debt are two separate elements of a refinancing transaction. Section 8.2 is concerned only with the incurrence element; it says nothing about whether Cumulus may use the proceeds of that incurrence to refinance the Unsecured Notes.

Nor can Cumulus credibly rely on Section 3.2, which merely states in general terms that Cumulus shall use the proceeds of the Revolving Loans for, among other things, general corporate purposes. Ex. 1 § 3.2. The Credit Agreement similarly provides that proceeds from Incremental Facilities, Term Loans, and certain letters of credit must be used for "general corporate purposes." *Id.* §§ 1.1, 4.25(b), 5.20. As a matter of contract interpretation, these general provisions are necessarily limited by and subject to all of the negative covenants contained in Section 8, including the specific prohibition in Section 8.8(j) on making Restricted Payments. *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'") (citing Restatement (Second) of Contracts § 203(c)).

### 4. Cumulus's interpretation of Section 8.8(j)(i) would swallow the rule against making Restricted Payments on Unsecured Notes.

Cumulus's expansive interpretation of the exception in Section 8.8(j)(i) – under which proceeds from any indebtedness whatsoever that Cumulus is permitted to incur may be used to "refinance" the Unsecured Notes – would eviscerate Section 8.8's prohibition against making

Restricted Payments on the Unsecured Notes, effectively writing it out of the Credit Agreement. The Court should reject a reading of Section 8.8(j)(i) that is broad enough to swallow the rule to which it is an exception. *See, e.g.*, *Pig Newton*, 95 F. Supp. 3d at 382–83 (rejecting interpretation of certain contract provision that "would require the Court to discard pages from each of the Trust Agreements, and could very easily cast doubt upon the validity of many other parts of the Trust Agreements"); *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 2007 WL 1988150, *12 (S.D.N.Y. July 10, 2007) (where loan agreement precluded lender from selling the loan to a competitor of the borrower except as part of a "Securitization," the court declined to read "Securitization" so broadly that the "exception … would completely swallow the rule"); *id.* at *19 (same conclusion regarding "Securitization" in another provision).

### 5.    Cumulus's interpretation would eviscerate Section 8(j)(ii).

Cumulus's reading of Section 8.8(j)(i) is also inconsistent with Section 8.8(j)(ii).  As explained above, Section 8.8(j)(ii) bars Cumulus from making Restricted Payments on the Unsecured Notes unless its Consolidated First Lien Net Leverage Ratio is 4:1 or less.  This leverage requirement in Section 8.8(j)(ii) is more stringent than the leverage requirement in Section 8.1, which precludes Cumulus from drawing on the Revolving Credit Facility unless its Consolidated First Lien Net Leverage Ratio is less than 5:1.

Cumulus's overly broad interpretation of refinancing under Section 8.8(j)(i) would improperly allow for an end-run around Section 8.8(j)(ii) and would, thus, gut that subsection in its entirety.  For example, if Cumulus's leverage ratio were above 4:1 but below 5:1, it would not be allowed to make prepayments on the Unsecured Notes under Section 8.8(j)(ii) but would be allowed to incur Revolving Loans.  Yet, if Cumulus's interpretation of Section 8.8(j)(i) were correct, it could (a) borrow Revolving Loans; (b) use the proceeds from these borrowings to make payments on the Unsecured Notes pursuant to Section 8.8(j)(i) as a so-called "refinan-

cing"; and (c) then, immediately repay the Revolving Loans with cash on its balance sheet that it could not have used to pay down the Unsecured Notes because it was above the 4:1 ratio. In other words, the Company's interpretation would allow Cumulus to make an end-run around Section 8.8(j)(ii)'s stringent leverage requirement with respect to Restricted Payments. Thus, Cumulus's interpretation of Section 8.8(j)(i) cannot be the proper interpretation as a matter of law because it would allow Cumulus to circumvent Section 8.8(j)(ii) and read the provision out of the Credit Agreement.

### 6. Cumulus's interpretation would allow it to avoid the Restricted Payments covenant.

As Cumulus concedes, under its reading of the Credit Agreement, a Permitted Refinancing of the Unsecured Notes would continue to be subject to Section 8.8's limitation on Restricted Payments, while any other type of "refinancing" would be freely prepayable. *See* Pl. Mem. 20–21. That would put Cumulus in a better position if it avoided compliance with the Permitted Refinancing requirements than if it complied with them. Such an anomalous result is inconsistent with the very concept of a Permitted Refinancing, which is designed to protect the Term Lenders' interests.

### 7. Precedent in analogous cases supports the Term Loan Parties' interpretation of the scope of Section 8.8(j).

There are two decisions, each of which applies New York law in the context of an exchange offer relating to indebtedness of a financially distressed company, that support the Term Loan Parties' position that the only refinancing of the Unsecured Notes allowed pursuant to the terms of the Credit Agreement is a Permitted Refinancing.

First, in *Citibank, N.A. v. Norske Skogindustrier ASA*, 2016 WL 1052888 (S.D.N.Y. Mar. 8, 2016) (Sullivan, J.), a financially distressed company launched an exchange offer that would have permitted certain holders of its unsecured notes to exchange their notes for a lesser amount

of secured notes.  The indenture trustee for other noteholders sought to enjoin the exchange offer on the grounds that it constituted a prohibited refinancing.  In response, the company contended that the refinancing was permitted under an exception for "qualified securitization financing." *Id.* at *3.  The Court rejected the company's interpretation, which construed the term "financing" to "include the very type of refinancing that is explicitly prohibited by [the permitted refinancing indebtedness exception]."  *Id.* at *4.  Relying on Your Honor's decision in *Pig Newton*, Judge Sullivan reasoned that such an approach would "effectively render [the permitted refinancing indebtedness exception] meaningless, since it would allow any refinancing through the back door of the [qualified securitization financing] provision."  *Id.*  Here, likewise, Cumulus should not be permitted to contort Section 8.8(j)(i) to render meaningless the general prohibition against Restricted Payments in Section 8.8, the 4:1 leverage test in Section 8.8(j)(ii) and the protections inherent in the definition of "Permitted Financing."

Second, *Bank of New York Mellon v. Realogy Corp.*, 979 A.2d 1113 (Del. Ch. 2008) involved a financially distressed company that also sought to exchange unsecured notes for a lesser amount of secured term loans.  The trustee for certain notes argued that the refinancing of unsecured notes with secured loans did not constitute "Permitted Refinancing Indebtedness" and was therefore prohibited by the negative covenants in the credit agreement.  *Id.* at 1125.  In response, the company relied on a provision in the credit agreement that allowed for the creation of liens under the credit agreement, and argued that it could therefore "add[]" those liens to the Permitted Refinancing Indebtedness over and above the security to which the refinanced indebtedness was entitled.  *Id.* at 1127.  The Delaware Court of Chancery, applying New York law, adopted the trustee's interpretation because it would give meaning to the entire definition of Permitted Refinancing Indebtedness "without turning any of it into apparent surplusage."  *Id.* at

1128.  The Court rejected the company's interpretation because it "would allow a mere proviso clause to entirely sap the vitality of what would otherwise be a significant restriction."  *Id.* at 1128; *see also id.* at 1127 (the company's interpretation would make the "exception … swallow[] the rule").

As demonstrated by *Citibank* and *Realogy*, the Term Loan Parties' interpretation of the Credit Agreement here is the proper interpretation because it gives effect to all of the provisions of Section 8.8(j) and, at the same time, does not allow the limited exceptions in Section 8.8(j) to swallow the general prohibition in Section 8.8 against making Restricted Payments to Unsecured Noteholders.

The cases cited by Cumulus (*see* Pl. Mem. 11) do not support a different conclusion and do not involve facts remotely similar to the facts in *Citibank*, *Realogy*, or the dispute presently before this Court.

> **B.   The use of proceeds from new secured Revolving Loans to repay Unsecured Notes is not a Permitted Refinancing.**

Cumulus has not even attempted to argue that its improper refinancing of the Unsecured Notes qualifies as a Permitted Refinancing under the Credit Agreement.[9]  Nevertheless, the definition of Permitted Refinancing shows just how carefully the Credit Agreement considered and determined the question of precisely which refinancing transactions would constitute Permitted Refinancings and which, like the transaction at issue here, would not.  The definition of Permitted Refinancing, set forth in Section 1.1 of the Credit Agreement, provides, in relevant part, as follows:

---

[9]   Cumulus waived this argument in connection with its affirmative summary judgment motion by failing to address it in its opening brief, despite its knowledge that the Term Loan Parties would argue that the proposed refinancing is not a Permitted Refinancing.  *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014).

"Permitted Refinancing":  with respect to all or any portion of any Indebtedness, any modification, refinancing, refunding, renewal or extension of such Indebtedness; provided that …

(ii) … such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended … and

(vii) to the extent that the Liens securing the Indebtedness being refinanced are subordinated to the Liens securing the Obligations, any Lien securing such refinancing Indebtedness is subordinated to the Liens securing the Obligations on terms at least as favorable (when taken as a whole) to the Lenders as those contained in the applicable subordination language (if any) for the Indebtedness being refinanced ….

Ex. 1 § 1.1.  Cumulus's proposed transaction violates clauses (ii) and (vii) of the definition of Permitted Refinancing.

      1.      **The Exchange Offer violates clause (ii) of the definition of Permitted Refinancing.**

Clause (ii) requires, in relevant part, that refinanced debt have "a final maturity date equal to or later than the final maturity date of … the Indebtedness being" refinanced.  Ex. 1 § 1.1.  In other words, to be a Permitted Refinancing, the new secured Revolving Loans must have a final maturity date equal to or later than the final maturity date of the Unsecured Notes.

Currently, the Revolving Credit Facility matures in December 2018 and the Unsecured Notes mature in May 2019.  SMF ¶¶ 131, 143.  As part of the Exchange Offer, Cumulus is seeking to extend the maturity date of the Revolving Credit Facility to November 2020.  *Id.* ¶ 176.  Under the Credit Agreement, however, extension offers are made on a Revolving Lender-by-Revolving Lender basis; therefore, if any existing Revolving Lender declines to assign its commitment to the new Revolving Lenders and does not agree to the proposed extension, then the maturity date of its commitment would remain the same — December 2018.  *See* Ex. 1

§§ 4.16(e), 4.24.  What is more, the Credit Agreement requires that all Revolving Loans be made *pro rata* by all Revolving Lenders, which precludes Cumulus from drawing Revolving Loans only from those Revolving Lenders who have agreed to the maturity date extension.  *Id.* §§ 4.16, 4.24.  Cumulus has admitted, as it must, that in order for the proposed transaction to qualify as a Permitted Refinancing, Cumulus would have to prove that 100% of the existing Revolving Lenders have either (i) agreed to a maturity date extension or (ii) agreed to assign their commitments as contemplated by the Exchange Offer.  SMF ¶ 189.

Cumulus has failed to provide any evidence that either 100% of the current Revolving Lenders have agreed to extend the maturity date of their commitments or have agreed to assign their commitments as contemplated by the Exchange Offer.  Accordingly, Cumulus cannot show that it has complied with clause (ii) of the definition of Permitted Refinancing.

### 2.   The Exchange Offer violates clause (vii) of the definition of Permitted Refinancing.

Clause (vii) prevents the Company from refinancing second lien debt into first lien debt. If the Company cannot refinance second lien debt into first lien debt, it necessarily follows that the Company cannot refinance Unsecured Notes into new secured Revolving Loans.  Absent such a commonsense interpretation, unsecured debt would receive better treatment under the Credit Agreement then secured, second lien debt, which is nonsensical.  *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Monarch Payroll, Inc.*, 2016 WL 634083, at *10 (S.D.N.Y. Feb. 17, 2016) ("New York law also provides that a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (quotations omitted).

This construction of clause (vii) of Permitted Refinancing is unmistakably confirmed by reference to Section 8.3(o) of the Credit Agreement, which permits the granting of a lien in

connection with a Permitted Refinancing; "provided that such security interests shall not apply to any property or assets that were not collateral for the Indebtedness [*i.e.*, the Unsecured Notes] being refinanced." Ex. 1 § 8.3(o). Thus, Section 8.3(o) is clear that, because the Unsecured Notes being refinanced were not secured by any collateral, then the indebtedness being used to refinance the Unsecured Notes cannot be secured by any collateral – and certainly not the Collateral already granted to the Term Loan Parties.

### III.   ALTERNATIVELY, CUMULUS'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED TO PERMIT THE PARTIES TO TAKE DISCOVERY REGARDING EXTRINSIC EVIDENCE OF THE MEANING OF SECTION 8.8.

If the parties have offered two reasonable interpretations of a contract provision, then courts will look to extrinsic evidence to determine the parties' intent, which becomes an issue of fact to be resolved at trial. *See Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 43 (2d Cir. 2006); *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048–49 (2d Cir. 1989). For the reasons stated above (*see* pp. 19–31, *supra*), the Term Loan Parties' interpretation of Section 8.8 is plainly reasonable. To the extent that the Court finds Cumulus's proposed interpretation to be another plausible reading of Section 8.8 and the other provisions of the Credit Agreement, a proposition that the Term Loan Parties stand firmly against, then the parties should proceed to discovery so that they can discover and develop extrinsic evidence concerning the meaning of Section 8.8, including evidence concerning the negotiation history and expert testimony. *See* Fed. R. Civ. P. 56(d); Primoff Decl. ¶¶ 25–28 (describing the discovery that the Term Loan Parties would seek if the Court determines that both parties have offered reasonable interpretations of Section 8.8).

**IV.   CUMULUS'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED FOR THE ADDITIONAL REASON THAT THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO WHETHER THE EXCHANGE OFFER VIOLATES CUMULUS'S IMPLIED OBLIGATIONS OF GOOD FAITH AND FAIR DEALING.**

"'Under New York law, every contract contains an implied covenant of good faith and fair dealing,' which requires that no party to that contract can do anything which will destroy or injure the right of another party to receive the benefits of the contract." *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994) (quoting *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230 (2d Cir. 1991)). "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994).

A party may breach its implied duty of good faith and fair dealing "where [the] party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007); *see, e.g.*, *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 632 (S.D.N.Y. 2010) (participation agreement, though permitted by credit agreement, constituted "end-run" around plaintiff's contractual right to veto assignments); *Chase*, 873 F. Supp. at 815 (declining to grant defendant's summary judgment motion with respect to implied covenant claim where defendant allegedly "systematically manipulating the sales of the Funds" which "dried up the stream of [] income it was obligated to pay to [plaintiff]").

Even if the Court determines that the Exchange Offer does not violate an express provision of the Credit Agreement, it should nonetheless deny Cumulus's motion for summary judgment because disputed issues of material fact exist with respect to Cumulus's duty of good

faith and fair dealing.  The negative covenants contained in Section 8 of the Credit Agreement, including Section 8.16, were put there to protect the Term Lenders.

However, as part of a bad-faith scheme to transfer valuable rights in the Collateral from the already under-collateralized Term Lenders to "out of the money" Unsecured Noteholders at the Term Lenders' sole expense, Cumulus is unfairly and unreasonably seeking to deprive the Term Lenders of these protections.  Much like in *Empresas*, the Exchange Offer would be an "end-run" around the bargained-for protections found in the negative covenants.  680 F. Supp. 2d at 632.  Contrary to Cumulus's contention, the Term Loan Parties are not seeking to create a new obligation under the Credit Agreement, but rather are simply seeking to protect the fruits of their contract.

Notably, Cumulus has made ***no showing*** that it made any kind of determination – reasonable or otherwise – as to whether its proposed amendments to the Credit Agreement would materially and adversely affect the Lenders.  Cumulus's failure to do so – together with the Term Loan Parties' lack of discovery as to whether Cumulus has acted in bad faith, *see* Primoff Decl. ¶ 30 – precludes entry of summary judgment in Cumulus's favor.[10]

Cumulus's contention that the implied covenant claim is duplicative should be rejected. A party is permitted to plead inconsistent theories of recovery and need not make an election prior to judgment.  Fed. R. Civ. P. 8(d)(3); *see also Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 333 (Bankr. S.D.N.Y. 1999) (courts have adopted a "wait and see" approach and can allow plaintiffs to plead alternative claims "until the status of the litigation requires an

---

[10]  "A determination of bad faith or willful or negligent disregard of the rights of the other party is generally a question of fact."  *Wallace v. Merrill Lynch Capital Servs., Inc.*, 814 N.Y.S.2d 566 (Sup. Ct. N.Y. County 2005) (table) (denying motion to dismiss implied covenant claim where, notwithstanding contractual provisions permitting set-off of debt owed by defendant to plaintiff, issue of fact existed as to whether defendant acted in bad faith when it sought to set off its debt to plaintiff with deeply discounted bonds).

election"); *Lemus v. Manhattan Car Wash, Inc.*, 2010 WL 4968182, at *9-11 (S.D.N.Y. Nov. 24, 2010) (discussing election of remedies upon consideration of motion for default judgment on two inconsistent claims for relief).  The Term Loan Parties have not moved for summary judgment with respect to the implied covenant of good faith and fair dealing claim, and therefore should not be forced to elect between alternative theories solely in defending against Cumulus's motion.

## V.   CUMULUS'S MOTION FOR SUMMARY JUDGMENT REGARDING THE MOST-FAVORED NATION CLAUSE SHOULD BE DENIED.

Count III of the Term Loan Parties' counterclaims alleges, as an alternative theory, that if the proposed transaction were a Permitted Refinancing, then Term Lenders would enjoy the benefit of the most-favored nation clause in Section 4.25 because an incremental revolving loan that is not freely prepayable because of the Restricted Payments covenant should be recharacterized as a term loan.  *See* ECF No. 37, Counterclaims ¶¶ 75–79, 98–106.  Cumulus purports to move for summary judgment on this claim.  If Cumulus is permitted to argue that its proposed transaction meets the definition of Permitted Refinancing (despite having waived this argument in its opening brief), the Term Lender Parties reserve their rights to respond.

## CONCLUSION

For all of the foregoing reasons, the Term Loan Parties respectfully request that the Court (i) deny Cumulus's motion for summary judgment; (ii) grant the Term Loan Parties' cross-motion for summary judgment; (iii) declare that the Exchange Offer violates Sections 8.8 and 8.16 of the Credit Agreement; and (iv) grant such other and further relief as the Court may deem just and proper.

Dated:  January 27, 2017

Respectfully submitted,

**ARNOLD & PORTER**
**KAYE SCHOLER LLP**

By:   /s/ Madlyn Gleich Primoff
Madlyn Gleich Primoff
Michael A. Lynn
Kyle D. Gooch
Negisa Balluku
250 West 55th Street
New York, NY 10019-9710
Tel.:  (212) 836-8000
Fax:  (212) 836-8689
madlyn.primoff@apks.com

**ARNOLD & PORTER**
**KAYE SCHOLER LLP**
Michael D. Messersmith (*pro hac vice*)
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Tel.:  (312) 583-2300
Fax:  (312) 583-2360
michael.messersmith@apks.com

*Attorneys for the Term Loan Parties*