**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CUMULUS MEDIA HOLDINGS INC. and CUMULUS MEDIA INC., <br><br>        Plaintiffs and Counterclaim-Defendants, <br><br>     v. <br><br> JPMORGAN CHASE BANK, N.A., as Administrative Agent under the Amended and Restated Credit Agreement among Cumulus Media Inc., Cumulus Media Holdings Inc., as Borrower, Certain Lenders, Royal Bank of Canada, and Macquarie Capital (USA) Inc., as Co-Syndication Agents, and Credit Suisse AG, Cayman Islands Branch, Fifth Third Bank, Goldman Sachs Bank USA and ING Capital LLC, as Co-Documentation Agents dated as of December 23, 2013, <br><br>        Defendant, <br><br>     –and– <br><br> ACIS CLO 2013-1 LTD. *et al*. <br><br>        Defendant-Intervenors and Counterclaim Plaintiffs. | Electronically Filed <br><br> Docket No.: 1:16-cv-09591 |

**JPMORGAN CHASE BANK'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF JPMORGAN'S CROSS-MOTION**
**FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................ 7

I.      JPMORGAN HAS NOT BREACHED THE AGREEMENT BECAUSE IT HAS BEEN "FULLY JUSTIFIED" IN REFRAINING FROM ACTING ON THE PROPOSED ASSIGNMENTS AND AMENDMENTS ..................................................... 7

      A.      JPMorgan Properly Relied On Section 10.4 In Refraining From Acting On The Assignments And Amendments. ..................................................... 7

      B.      JPMorgan Has Not "Unreasonably Withheld or Delayed" Acting On The Proposed Assignments. .......................................................................... 9

II.     SECTION 8.8 PROHIBITS CUMULUS'S PROPOSED TRANSACTION ................... 11

      A.      Section 8.8(j) Does Not Permit The Proposed Transaction. ................................... 11

            1.      For A Refinancing To Be "Permitted Pursuant To The Terms Hereof," It Must Be A Permitted Refinancing. .......................................... 12

            2.      Cumulus's Interpretation Would Improperly Create Two Categories Of Permitted Refinancing; One That Meets The Requirements, And One That Does Not. .................................................. 15

            3.      Other Provisions of the Agreement Make Clear That Cumulus Can Lower But Not Elevate The Priority of the Senior Noteholders. .............. 18

      B.      The Proposed Transaction Is Not A Permitted Refinancing. ................................ 19

CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Athar v. Hudson Serv. Mgmt., Inc.*,
48 A.D.3d 721 (2d Dep't 2008) ........................................................................ 10

*Innovative Biodefense, Inc. v. VSP Techs., Inc.*,
176 F. Supp. 3d 305 (S.D.N.Y. 2016) ............................................................... 7

*Kuhns Bros. v. Fushi Int'l, Inc.*,
No. 3:06-cv-1917 PCD, 2007 WL 2071622 (D. Conn. July 16, 2007) .................... 15

*Lago v. Krollage*,
78 N.Y.2d 95 (1991) ........................................................................................ 9

*M/A-COM Sec. Corp. v. Galesi*,
904 F.2d 134 (2d Cir. 1990) ............................................................................. 11

*Silver v. Rochester Sav. Bank*,
73 A.D.2d 81 (4th Dep't 1980) ......................................................................... 10

*Sunbelt Rentals, Inc. v. Charter Oak Fire Insurance Co.*,
839 F. Supp. 2d 680 (S.D.N.Y. 2012) ............................................................... 14

## PRELIMINARY STATEMENT

When Cumulus borrowed $2 billion from a syndicate of Term Lenders in December 2013, it agreed that for the seven-year term of those secured loans it would not "prepay" — repay before due — $610 million worth of unsecured Senior Notes due in 2019, except in the circumstances defined in the governing credit agreement (the "Agreement").[1]  Cumulus now seeks to prepay those Senior Notes in a manner that the Agreement does not permit, and certain Term Lenders have objected.  As Administrative Agent under the Agreement, JPMorgan has properly refrained from acting on the proposed transaction unless directed by the Lenders or until the dispute is otherwise resolved.  The Court should deny Cumulus's summary judgment motion, and grant JPMorgan's summary judgment motion, for the following reasons.

*First*, Cumulus's breach of contract claim against JPMorgan should be dismissed.  As Administrative Agent, JPMorgan has a purely administrative, non-fiduciary role, in which its duties are expressly limited to those set forth in the Agreement.  As authorized by the Agreement, and in light of the apparent dispute between Cumulus and the Term Lenders, JPMorgan declined to consent to assignments or execute documents implementing the proposed transaction without the "advice or concurrence" of a majority of the Lenders.  As a matter of law, there has been no breach and, to the contrary, JPMorgan has acted reasonably and in good faith by refraining from acting in the current circumstances.

*Second*, the remainder of Cumulus's complaint should be dismissed and JPMorgan's cross-motion should be granted because the proposed transaction is not permitted under the Agreement, which generally prohibits Cumulus from prepaying the Senior Notes unless an exception applies.  The exception Cumulus relies upon, in Section 8.8(j), allows it to prepay the

---

[1]   Capitalized terms that are not defined herein have the meaning defined in Cumulus's memorandum of law and/or statement of material facts.

1

Senior Notes in connection with a "refinancing . . . permitted pursuant to the terms [of the Agreement as a whole]." The Agreement lays out the requirements for a "Permitted Refinancing," which include, among other things, provisions requiring any such refinancing to respect existing lien priorities among Cumulus's creditors. Knowing that its proposed transaction does not meet those requirements, Cumulus argues that its refinancing is permitted even though it is not a "Permitted Refinancing." But that ignores the very point of the Permitted Refinancing definition; to identify the requirements a refinancing must meet to be permitted, and to provide certain protections to the Lenders. The plain words and obvious intent of the Agreement, which this Court can interpret and apply in ruling on summary judgment, require that for a refinancing to be permitted, it must meet *all* terms of the Agreement, including the requirements for a Permitted Refinancing.

## BACKGROUND

JPMorgan is the Administrative Agent under the December 13, 2013 Agreement by which Cumulus borrowed $2.025 billion in secured Term Loans maturing in December 2020 and entered into a $200 million secured Revolving Credit Facility maturing in December 2018. Cumulus SMF ¶¶ 11, 15, 22.[2] Although JPMorgan also is a Revolving Lender, it is a party to and participates in this action solely in its role as Administrative Agent. Dkt. # 1.

As Administrative Agent, JPMorgan does not have "any fiduciary relationship to any Loan Party" or to any Lender. Agreement, §§ 11.12(b), 10.1. Instead, the Administrative

---

[2]     Citations to facts contained in Cumulus's Local Rule 56.1 Statement of Undisputed Material Facts ("Cumulus SMF") incorporate the record citations therein. Citations to facts contained in JPMorgan's Rule 56.1 Statement of Undisputed Material Facts ("JPMorgan SMF") incorporate the record citations therein. Citations to "Agreement, § __" refer to Exhibit B of the January 13, 2017 Declaration of Justin B. Weiner. Dkt. # 91-2. Citations to the Cumulus SEC Form 8-K dated December 6, 2016 (the "Dec. 6 8-K") refer to Exhibit A of the January 13, 2017 Declaration of Justin B. Weiner. Dkt. # 91-1.

Agent's duties are only those "expressly set forth" in the Agreement, and "no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent."  Agreement, § 10.1.

The Agreement acknowledges that, in addition to the Term Loans and Revolving Loans provided for under the Agreement, Cumulus may have other forms of indebtedness, but expressly limits that other indebtedness to the categories prescribed in Section 8.2 of the Agreement.  Agreement, § 8.2.  Thus, for example, Section 8.2(h) acknowledges that as of the date of the Agreement, Cumulus had outstanding indebtedness under the Senior Notes, and expressly permitted Cumulus to "[c]reate, incur, assume or suffer to exist" such indebtedness "in respect of the Senior Notes . . . and any Permitted Refinancing thereof."  *Id.*

Under the Agreement, a "Permitted Refinancing" must meet several conditions, which are broadly designed to protect the Lenders from a refinancing that would prejudice them, such as by increasing Cumulus's aggregate indebtedness, elevating the payment or lien priority of the debt being refinanced, or providing terms to other creditors that are more favorable than those contained in the Agreement.  Agreement, § 1.1 ("Permitted Refinancing").

The Agreement also limits Cumulus's ability to secure other indebtedness, limiting the liens that it may grant on indebtedness to those prescribed in Section 8.3.  Agreement, § 8.3.  With respect to liens securing any Permitted Refinancing, Section 8.3(o) expressly provides that any "such security interests shall not apply to any property or assets that were not collateral for the Indebtedness being refinanced."  *Id.*

Cumulus currently owes approximately $1.8 billion on the Term Loans.  Cumulus SMF ¶ 18.  The $200 million Revolving Credit Facility has not been drawn and Cumulus is currently unable to draw upon it.  *Id.* ¶¶ 33, 60.  Loans made under the Agreement (whether Term Loans

or Revolving Loans) are secured by substantially all of Cumulus's assets.  *Id.* ¶¶ 14, 26.  At present, Cumulus also has outstanding $610 million of the Senior Notes, which are due in 2019.  *Id.* ¶¶ 36, 38.  The Senior Notes are unsecured.  *Id.*

On December 6, 2016, Cumulus announced the proposed transaction that is the subject of this lawsuit (the "Proposed Transaction").  Dec. 6 8-K at 2.  Under the Proposed Transaction, Cumulus would exchange the Senior Notes for a combination of Cumulus common stock and up to $305 million in secured debt borrowed under the Revolving Credit Facility.  *Id.* at 4–5.  The Proposed Transaction contemplates that the existing undrawn Revolving Credit Commitments would be assigned from the current Revolving Lenders to new Revolving Lenders who are acting in concert with and at the direction of the Senior Noteholders.  *Id.* at 3.  Those new Revolving Lenders would then agree with Cumulus to amend the Agreement in ways necessary to implement the Proposed Transaction.  *Id.* at 5.  Specifically, the new Revolving Lenders and Cumulus would agree to remove a financial covenant that prevents Cumulus from drawing on the Revolving Credit Commitments unless its First Lien Net Leverage Ratio is less than 5.00 to 1.00.  *Id.* at 5.  They would also increase the interest rate on the Revolving Loans, increase the commitment fee, extend the maturity date, and add an "Incremental Revolving Facility" that would increase the amount available under the Revolving Facility from $200 million to $305 million.  *Id.*

Of course, none of these steps has been attempted (or could be accomplished) by Cumulus with the current Revolving Lenders, because Cumulus is out of compliance with the leverage ratio necessary to borrow under the Revolving Facility, and because the current Revolving Lenders would neither waive that condition nor agree to the additional $105 million Incremental Revolving Facility.  That is why Cumulus is asking current Revolving Lenders to

4

assign their commitments to the new Revolving Lenders; the current Revolving Lenders would then be out of the picture.

If these assignments are effected, and the Agreement is amended in the manner Cumulus proposes, Cumulus would then borrow the entire $305 million under the amended Revolving Facilities and use it to pay off Senior Noteholders at 50% of the face value of the Senior Notes in exchange for giving them a first-lien security on the remaining 50% of their debt and also giving them some Cumulus common stock.  Dec. 6 8-K at 4–5.

The net effect of the Proposed Transaction would be for the $610 million of currently *unsecured* Senior Notes to be transformed into $305 million of *secured* Revolving Loans plus some Cumulus common stock.  *Id.*  And, despite calling this a "refinancing," the transaction will not inject any new cash into Cumulus or involve any new outside source of finance — the economics are that the Senior Noteholders are forgiving half of the face value of their unsecured (and underwater) debt in exchange for getting a first-lien security interest on the remainder.  And the Revolving Facility, intended to be used for short-term borrowing, repayment, and borrowing again, will effectively be turned into long-term debt.

Cumulus has taken preliminary steps to implement its Proposed Transaction.  On November 30, 2016, JPMorgan received requests from certain of the current Revolving Lenders, seeking JPMorgan's consent to the assignment of their Revolving Credit Commitments to new Revolving Lenders.  JPMorgan SMF ¶ 116.  The proposed new Revolving Lenders are affiliated with Angelo, Gordon & Co., L.P.  Cumulus SMF ¶ 88.

On December 2, 2016, counsel for an ad hoc group of Term Lenders sent a letter to counsel for JPMorgan, expressing concern that the proposed assignments would be improper under the Agreement.  JPMorgan SMF ¶ 115.

On December 6, 2016, Cumulus announced that it had entered into a "refinancing support agreement" with holders of approximately $350 million of the Senior Notes, and would pursue the Proposed Transaction for up to all $610 million of the Senior Notes.  Dec. 6 8-K at 2. Cumulus asked JPMorgan to "promptly confirm that [JPMorgan] (i) have or will consent to the assignments of Revolving Credit Commitments to Angelo Gordon and (ii) will execute the attached Credit Agreement amendments upon consummation of the exchange."  Cumulus SMF ¶ 88.

On December 9, 2016, JPMorgan posted a letter to Lenders and to Cumulus explaining that, pursuant to Section 10.4 of the Agreement, it currently intended to refrain from taking any action in respect of the proposed assignments or the proposed amendments.  JPMorgan SMF ¶ 116.  The letter further advised that JPMorgan would host a conference call the following week to discuss the Proposed Transaction and related requests, and that JPMorgan had invited Cumulus to address the Lenders on that call regarding the Proposed Transaction.  *Id.*

On the next business day, December 12, 2016, Cumulus filed its complaint against JPMorgan, seeking declaratory judgment and specific performance, and alleging breach of contract.  Dkt. # 1.  On December 22, 2016, the Court allowed a group of Term Lenders to intervene.  Dkt. # 32.  Pursuant to the schedule set by the Court, Cumulus filed a motion for summary judgment on January 13, 2017.  Dkt. # 88.

In light of the foregoing, JPMorgan is not currently acting on the assignments, other than continuing to evaluate whether the proposed assignees are "Eligible Assignees" under the Agreement, in the event that the Lenders reach an agreement with Cumulus that resolves the current objections to the Proposed Transaction or the Court otherwise permits the transaction to go ahead.  Cumulus SMF ¶ 89.

**ARGUMENT**

**I.    JPMORGAN HAS NOT BREACHED THE AGREEMENT BECAUSE IT HAS BEEN "FULLY JUSTIFIED" IN REFRAINING FROM ACTING ON THE PROPOSED ASSIGNMENTS AND AMENDMENTS**

Cumulus's breach of contract claim against JPMorgan should be dismissed — regardless of how the Court rules on whether the Proposed Transaction is permitted to proceed — because as a matter of law JPMorgan has not breached the Agreement.[3]

**A.    JPMorgan Properly Relied On Section 10.4 In Refraining From Acting On The Assignments And Amendments.**

Cumulus alleges that JPMorgan breached the Agreement because it has not consented to the proposed assignments and executed the proposed amendments that are part and parcel of the Proposed Transaction.  Compl. ¶¶ 90, 92.  With respect to the assignment of Revolving Credit Commitments, Cumulus cites Section 11.6(c), which allows Revolving Lenders to assign their loan commitments "when the Administrative Agent has given written consent, which is 'not to be unreasonably withheld or delayed.'"  *Id.* ¶ 89; Cumulus SMF ¶ 45.  And with respect to the proposed amendments to the Agreement, Cumulus contends that Section 11.1 allows it to amend the leverage ratio covenants, and that Section 4.25 allows it to amend the Agreement to create an Incremental Revolving Facility, without JPMorgan's consent, even though such amendments require JPMorgan's signature in order to become effective.  Compl. ¶¶ 48, 51, 56, 58.  But JPMorgan was and is expressly permitted by the Agreement to refrain from taking the actions requested by Cumulus.

Cumulus filed this lawsuit asking the Court to determine the propriety of the Proposed Transaction six days after Cumulus announced the transaction, five days after it asked JPMorgan

---

[3]    Under New York law, the "essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach."  *Innovative Biodefense, Inc. v. VSP Techs., Inc.*, 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016).

7

to confirm that it would execute documents necessary to implement the transaction, and one business day after JPMorgan said it wanted Cumulus to address the Lenders (including the objecting Term Lenders) at a meeting to discuss the Proposed Transaction.  Cumulus SMF ¶¶ 88–90; JPMorgan SMF ¶ 116.  Knowing that a group of Term Lenders objected to the Proposed Transaction, that as Administrative Agent it too had concerns about Cumulus's interpretation of the Agreement, and that the parties' rights would likely be resolved in Court if not first resolved consensually, JPMorgan took the only reasonable and responsible course of action available to it in the circumstances as the Administrative Agent — decline to act until the parties could come to an agreement or the Court could rule on Cumulus's lawsuit.[4]  JPMorgan cannot be faulted or be held to have breached the Agreement in such circumstances.

Refraining from taking any action on the assignments and amendments was not only the responsible thing for JPMorgan to do, it was expressly permitted under the Agreement, which provides that:

> The Administrative Agent shall be *fully justified* in failing or refusing to take *any* action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, where unanimous consent of the Lenders is expressly required hereunder, such Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

---

[4]    Indeed, in its Form 8-K announcing the Proposed Transaction, Cumulus indicated that it expected a court would need to resolve the issue.  Dec. 6 8-K at 2 (stating that a condition of the Refinancing Support Agreement is that Cumulus receive either "an order of a court of competent jurisdiction (a) declaring that (x) the transactions contemplated therein are not in violation of the existing credit agreement" and ordering the Administrative Agent to consent to the assignments and amendments or, in the alternative, written assurance from the Administrative Agent that it will do so absent a court order).

Agreement, § 10.4 (emphasis added); *see also id.* § 10.10 (applying the same protections to JPMorgan in its capacity as Issuing Lender).[5]  It is undisputed that JPMorgan has not received the advice or concurrence of the Required Lenders as to the proposed assignments and amendments.  In fact, just the opposite occurred; before the lawsuit was filed, JPMorgan received a letter from counsel for certain Term Lenders stating their concerns and objections to the Proposed Transaction.  JPMorgan SMF ¶ 115.  Nor has JPMorgan received any indemnification from the Lenders.

Section 10.4 unambiguously protects JPMorgan in these circumstances.  JPMorgan has met its obligations as Administrative Agent by notifying the Lenders and Cumulus that, pursuant to Section 10.4, it would refrain from acting on the proposed assignments and amendments, and for having continued to take that position during the pendency of this lawsuit until the Court can decide whether the Proposed Transaction is permitted to proceed.  As a result, there has been no breach of the Agreement, and that claim should be dismissed.[6]

### B.    JPMorgan Has Not "Unreasonably Withheld or Delayed" Acting On The Proposed Assignments.

Cumulus also argues that JPMorgan is unreasonably withholding its consent to the assignments of Revolving Credit Commitments from the current Revolving Lenders to the proposed new Revolving Lenders, notwithstanding the protections afforded JPMorgan under

---

[5]   The Agreement further provides that:  "Neither the Administrative Agent nor any of its officers, directors, employees, [etc.] shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with the Loan Documents (except for its or such Person's own gross negligence or willful misconduct.").  Agreement, § 10.3.  Such exculpatory agreements are routinely enforced.  *Lago v. Krollage*, 78 N.Y.2d 95, 100 (1991).  Section 10.3 reinforces that the parties intended to insulate the Administrative Agent from any legal responsibility for inaction consistent with the Agreement.

[6]   In its moving brief, Cumulus allows for the possibility that JPMorgan may not have breached the Agreement, arguing that the Court should grant its motion "even if JPMorgan has been — until now — 'justified' in not signing the assignments and amendments."  Pl. Br. at 25.  As noted above, Cumulus's December 6, 2016 Form 8-K anticipates that the Proposed Transaction will require Court approval.  Dec. 6 8-K at 2.

Section 10.4.  The "unreasonableness," according to Cumulus, is that JPMorgan's decision to refrain from acting is allegedly not based on "objective factors" and is instead based on the Term Lenders' disapproval of the Proposed Transaction.  Pl. Br. at 23.  Cumulus is incorrect.

Section 10.4 says that JPMorgan is "fully justified" in refraining from taking action under "any Loan Document" unless the Required Lenders have given their advice or concurrence, or the Lenders have agreed to indemnify JPMorgan against any liability from taking the requested action.  None of those things has occurred, and it is beyond dispute that the request for JPMorgan to consent to an assignment of Revolving Credit Commitments under Section 11.6(c) of the Agreement is a request that it take "any action under any Loan Document."  Thus, JPMorgan has reasonably refrained from acting on the assignments, as Section 10.4 authorizes it to do.[7]

The only authority Plaintiffs cite for the proposition that refusal of consent must be based on "objective reasons" are two inapposite cases that concerned improper attempts to use a consent requirement as an opportunity to extract value not permitted by the contract.  Pl. Br. at 23 (citing *Athar v. Hudson Serv. Mgmt., Inc.*, 48 A.D.3d 721, 722 (2d Dep't 2008) and *Silver v. Rochester Sav. Bank*, 73 A.D.2d 81, 82–84 (4th Dep't 1980)).  In *Athar*, the court held that a landlord could not condition its consent to a sublease of a gas station on an *ex gratia* payment of $60,000.  48 A.D.3d at 722.  And in *Silver*, the court held that a bank could not condition its consent to assignment of a mortgage on the assignee's agreement to a higher interest rate, because the mortgage gave the bank no such right.  73 A.D.2d at 83–84.  Neither of these cases provides any guidance on the question at issue here:  whether an Administrative Agent whose consent to an assignment is sought may rely on a separate provision of the contract permitting it to refrain from taking any action on that assignment.  The fact that JPMorgan has not received

---

[7]     JPMorgan continues to evaluate the proposed assignees to determine whether they are Eligible Assignees, in the event that the Proposed Transaction is permitted to proceed.  Cumulus SMF ¶ 89.

the advice or concurrence of the Required Lenders, or an agreement from the Lenders to indemnify it against any liability, makes JPMorgan's inaction both objectively reasonable and fully justified under the Agreement.  *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).  There has thus been no unreasonable withholding of consent.

## II.    SECTION 8.8 PROHIBITS CUMULUS'S PROPOSED TRANSACTION

Based on a plain reading of the Agreement, the Proposed Transaction is not permitted pursuant to Section 8.8(j).  Accordingly, the Court should deny Cumulus's motion for summary judgment, and grant JPMorgan's motion for summary judgment dismissing the Complaint and entering judgment on the Term Lenders' first counterclaim for declaratory judgment.

### A.    Section 8.8(j) Does Not Permit The Proposed Transaction.

As Cumulus acknowledges, "Section 8.8 generally prohibits Cumulus from 'mak[ing] . . . prepayments on the principal of the Senior Notes,'" unless one of the exceptions enumerated in Section 8.8 applies.  Pl. Br. 8-9.  That section enumerates three exceptions that are potentially applicable:

1.  Exchange the Senior Notes for Cumulus common stock (Section 8.8(i)) or, to similar effect, repay the Senior Notes with the proceeds of a stock issuance (Section 8.8(h));

2.  Refinance the Senior Notes in a manner permitted pursuant to the terms of the Agreement as a whole (Section 8.8(j)(i)); or

3.  Comply with a 4:1 net leverage ratio and not create a default (Section 8.8(j)(ii)).[8]

Cumulus hangs its hat on the second exception, set forth in Section 8.8(j)(i), which provides that:

> [Cumulus] . . . may make payments in respect of the Senior Notes and any Permitted Refinancing thereof (i) in connection with any

---

[8]    Cumulus cannot invoke this exception because it currently does not meet the Consolidated First Lien Net Leverage Ratio.  Cumulus SMF ¶ 60.

> refinancing of the Senior Notes or any Permitted Refinancing thereof permitted pursuant to the terms hereof . . . .

Agreement, § 8.8(j).  Cumulus contends that the Proposed Transaction is a "refinancing of the Senior Notes . . . permitted pursuant to the terms hereof."  But Cumulus only reaches that result by ignoring the plain and ordinary meaning of those words, and asserting an interpretation that would be illogical and would create inconsistencies in the Agreement.

      1.     *For A Refinancing To Be "Permitted Pursuant To The Terms Hereof," It Must Be A Permitted Refinancing.*

Cumulus glosses over the requirement that any refinancing of the Senior Notes be one that is "permitted pursuant to the terms hereof," which requires the Court to consider whether it is permitted by the terms of the Agreement *as a whole*.  The definition of "hereof" in § 1.2(b) demands as much, stating that "'hereof' . . . shall refer to this Agreement as a whole."  Agreement, § 1.2(b).  Thus, Cumulus cannot invoke Section 8.8(j)(i) to refinance the Senior Notes unless the refinancing is "permitted pursuant to the terms [of the Agreement as a whole]."

Helpfully, the Agreement includes a provision directly addressing the circumstances in which a refinancing is permitted, titled: "Permitted Refinancing."  Agreement, § 1.1, "Permitted Refinancing."  And in its identification of categories of indebtedness that Cumulus is permitted to incur, the Agreement provides that Cumulus may incur or maintain "Indebtedness of the Borrower in respect of the Senior Notes outstanding on the [date of the Agreement] *and any Permitted Refinancing thereof*."  *Id.* § 8.2 (emphasis added).  Naturally, then, to determine whether the terms of the Agreement as a whole permit Cumulus's Proposed Transaction to refinance the Senior Notes, determining whether the refinancing is a Permitted Refinancing is the obvious starting point.[9]  Cumulus, however, knowing full well that its Proposed Transaction does

---

[9]     As more fully discussed at pages 19-20, *infra*, the Proposed Transaction is not a Permitted Refinancing under the terms of Section 1.1 of the Agreement.

not meet the requirements of a Permitted Refinancing, advocates the opposite.  Pl. Br. at 9-11.

As Cumulus would have it, to determine whether a refinancing of the Senior Notes is "permitted

pursuant to the terms [of the Agreement as a whole]," the Court should determine whether any

*other* provision of the Agreement permits the refinancing, and *ignore* the "Permitted

Refinancing" provision.  That argument confounds the plain and ordinary meaning of the

Agreement and should be rejected as a matter of law.

The provision of the Agreement that Cumulus says "permits" this transaction — Section

8.2(a) — does not even hint at any application to a refinancing of the Senior Notes, let alone say

which kinds of refinancing are permitted.  It simply recognizes that Cumulus can incur debt

under the Agreement.  Yet Cumulus asserts that "[b]ecause the Revolving and Incremental

Revolving Facilities are permitted by Section 8.2, they are 'refinancing . . . permitted pursuant to

the terms hereof.'"  Pl. Br. at 11.  In other words, according to Cumulus, because it is permitted

to borrow under the Revolving Facilities (assuming that the various assignments and

amendments are executed), then it can do whatever it wants with the money, including

refinancing the Senior Notes.  But Section 8.2(a) merely says that Cumulus is allowed to incur

indebtedness under the Agreement (including its Revolving Facilities) — it says nothing about

the conditions on that indebtedness or what Cumulus can do with it, which requires one to look

elsewhere in the Agreement.  Section 8.2(h), on the other hand, plainly anticipates that the Senior

Notes will be replaced, if at all, only with a Permitted Refinancing.[10]

Cumulus's reliance on Section 3.2 of the Agreement, which specifies how Cumulus can

use the proceeds from the Revolving Loans, including using them for "general corporate

purposes," fares no better.  Pl. Br. at 11, n.8.  Section 3.2 says nothing about refinancing the

---

[10]   Agreement, § 8.2(h) (permitting Cumulus to incur "Indebtedness of the Borrower in respect of the
Senior Notes outstanding on the [date of the Agreement] and any Permitted Refinancing thereof.").

Senior Notes.[11]  Agreement, § 3.2.  And the phrase "general corporate purposes" must be interpreted in light of the nature of the Revolving Facility as a facility for borrowings "from time to time" that are borrowed, repaid, and available again for reborrowing.  Agreement, § 3.1. Nothing in the provisions relating to the Revolving Facility suggests that it was intended for a long-term refinancing of the Senior Notes that is not a Permitted Refinancing.

In short, Cumulus says that its Proposed Transaction is a "refinancing . . . permitted pursuant to the terms hereof" because it is allowed to borrow under the Revolving Facility and it can use the money for general corporate purposes.  That is as loose a test as one could imagine, and is not a fair reading of Section 8.8(j)(i), which instead mandates an inquiry as to whether the *refinancing of the Senior Notes* is permitted, not just whether the *borrowing* of money as part of that refinancing is permitted.

Cumulus also argues that the Agreement's use of the "generic" terms "refinancing" and "permitted" shows that the parties intended a different meaning than the defined term "Permitted Refinancing."  Pl. Br. at 11-12.  But the cases Cumulus cites do not support its argument.  The primary case it relies on is *Sunbelt Rentals, Inc. v. Charter Oak Fire Insurance Co.*, 839 F. Supp. 2d 680, 688 (S.D.N.Y. 2012), in which Magistrate Judge Maas held that a rental form's use of the word "equipment" was intended to be broader than the defined term "Equipment," in part because other language indicated that an ongoing obligation was triggered by any use of the lessor's "equipment," not just the "Equipment" that was the subject of the rental at issue.  The Court's analysis in that case makes clear that one cannot view a contract's terms in isolation and

---

[11]   In fact, the only part of Section 3.2 that addresses repayment of debt is subsection (b), which says Cumulus can use proceeds from the Revolving Loans to "repay Swing Line Loans and Revolving Credit Loans after the Restatement Effective Date."  Agreement, § 3.2.  Had Section 3.2 intended to permit use of the Revolving Loans to refinance the Senior Notes, one would have expected it to say so.

conclude that use of a generic term was intended to mean something different than a defined term.  And here, where the surrounding language specifies that a refinancing is only allowed if "permitted pursuant to the terms [of the Agreement as a whole]," *Sunbelt* provides no support for the proposition that the Permitted Refinancing definition should be excised from the analysis of whether a refinancing is permitted.[12]  The drafters here used the phrase "permitted pursuant to the terms [of the Agreement as a whole]" to indicate that a refinancing is required to meet *all* terms of the Agreement, including the Permitted Refinancing requirements and any other provisions applicable to any particular refinancing.

> 2. *Cumulus's Interpretation Would Improperly Create Two Categories Of Permitted Refinancing; One That Meets The Requirements, And One That Does Not.*

To try and convince the Court to ignore the "Permitted Refinancing" definition, Cumulus contends that the Agreement contemplates a whole different category of refinancings that are not "Permitted Refinancings" but are nonetheless somehow permitted pursuant to the terms of the Agreement as a whole.  Pl. Br. at 9-11.  Thus, under Cumulus's misinterpretation, there would be two different categories of permitted refinancing:  (1) a "Permitted Refinancing" of the Senior Notes that meets the requirements of Section 1.1 of the Agreement; and (2) a "refinancing of the Senior Notes . . . permitted pursuant to the terms hereof" that is determined based on whether it meets provisions of the Agreement *other than* the definition of "Permitted Refinancing."  This argument is illogical and would create anomalous results elsewhere in the Agreement, which shows that the parties never intended it.

---

[12]   The other case Cumulus cites, *Kuhns Bros. v. Fushi Int'l, Inc.*, No. 3:06-cv-1917 PCD, 2007 WL 2071622 (D. Conn. July 16, 2007), is off-point.  In *Kuhns*, the Court considered whether the parties' "engagement" was fully coextensive with their "Agreement."  *Id.* at *6–7.  The Court found that several terms of the agreement led to the conclusion that they were not coextensive, in part because they were different words.  *Id.*  at *7.  While the Court noted in passing that one term was capitalized and not the other, the comment is dicta.  *Id.* at *6.

It makes no sense that the parties would have crafted a restrictive set of conditions on any

Permitted Refinancing, and then allow other refinancings of the Senior Notes regardless of

whether they meet the Permitted Refinancing definition.  Nor does the Agreement permit such an

interpretation.  The definition of Permitted Refinancing says it applies to "*any* modification,

refinancing, refunding, renewal or extension of such Indebtedness."  Agreement, § 1.1 (emphasis

added).  Cumulus's position amounts to an assertion that the definition applies to any refinancing

*except this one*.[13]  There is no textual basis to read the Agreement to carve out this Proposed

Transaction from the requirements for Permitted Refinancings.

Cumulus's argument that the Proposed Transaction need not satisfy the "Permitted

Refinancing" test would also, if accepted, create the anomalous result that Section 8.8 would no

longer apply to the refinanced Senior Notes (which would become Revolving Loans) if this

transaction goes ahead.  That is because Section 8.8 only restricts payments of principal on "the

Senior Notes or any Permitted Refinancing of the Senior Notes."  And since, says Cumulus, the

Proposed Transaction is not and does not have to be a Permitted Refinancing, Section 8.8 would

no longer prevent Cumulus from making Restricted Payments on the refinanced Senior Notes.

Indeed, Cumulus asserts as much in Section IV.A of its moving brief, arguing that if the

Proposed Transaction is allowed to proceed, the refinanced Senior Notes will be forever free

from Section 8.8(j) because they are no longer "Senior Notes" and because they are not a

"Permitted Refinancing thereof."  Pl. Br. at 20-21.  This would be an anomalous result — that a

"Permitted Refinancing" of the Senior Notes would still in future be restricted by Section 8.8,

---

[13]   Section 8.8(j)(i) requires that not only an initial refinancing, but also any subsequent refinancing, must meet the same test that it be permitted pursuant to the terms of the Agreement as a whole. Agreement, § 8.8(j)(i) ("the Borrower . . . may make payments in respect of . . . any Permitted Refinancing [of the Senior Notes] (i) in connection with any refinancing of the Senior Notes or any Permitted Refinancing thereof permitted pursuant to the terms hereof . . . .").

but a "refinancing . . . permitted pursuant to the terms hereof" is somehow different and would forever exempt the refinanced Senior Notes from the restrictions of Section 8.8.  The Court should not adopt an interpretation of the Agreement that would lead to such an anomalous outcome.

Cumulus also contends that "context provided by other terms" of the Agreement support the existence of a separate category of permitted refinancings.  Pl. Br. at 12-13.  It points to three other provisions of the Agreement that use the word "refinancing" rather than "Permitted Refinancing."  But none of those provisions supports Cumulus's argument, and one of them — Section 8.15 — reinforces why Cumulus's interpretation of Section 8.8(j) is wrong.  Section 8.15 prohibits Cumulus from making any prepayment of any Subordinated Indebtedness, except (among other things) "in connection with *any refinancing* of any Subordinated Indebtedness *permitted pursuant to the terms hereof*."  Agreement, § 8.15 (emphasis added).  The operative language is thus the same as Section 8.8(j)(i).  Applying Cumulus's Section 8.8(j)(i) argument to Section 8.15, Cumulus would presumably say that it can conduct any refinancing of the Subordinated Indebtedness if it is permitted to borrow the money.  Such a test is no test at all.  Section 8.15, just like Section 8.8(j)(i), instead directs the reader to consult those provisions of the Agreement that address whether the manner of the proposed refinancing of the Subordinated Indebtedness is permitted, which again requires that one check whether it is a Permitted Refinancing and whether any other terms applicable to the refinancing are met.

The other two provisions Cumulus cites as relevant "context," Sections 8.2(e) and 4.5(c), have nothing to do with Restricted Payments of the type that are at issue here, or whether a particular refinancing is permitted.  And the fact that those two provisions, neither of which applies here, refer to lower-case "refinancings" rather than "Permitted Refinancings" is a

vanishingly thin reed upon which to build an argument that this Proposed Transaction is "permitted" even though it is not "Permitted."

> 3.   *Other Provisions of the Agreement Make Clear That Cumulus Can Lower But Not Elevate The Priority of the Senior Noteholders.*

Cumulus's argument is also inconsistent with the only provision of the Agreement that expressly addresses exchange offers for the Senior Notes.  Section 8.8(i) says that Cumulus can prepay the Senior Notes if it is exchanging them for Cumulus common stock:

> [Cumulus] and its Restricted Subsidiaries may convert or exchange all or any part of the Senior Notes or any Permitted Refinancing thereof to Capital Stock (other than Disqualified Stock) of [Cumulus Media Inc.]

Agreement, § 8.8(i).

In an exchange offer under Section 8.8(i), the Senior Noteholders who accept the exchange would relinquish their unsecured debt and would become shareholders of Cumulus, which would thereby *lower* their priority in the Company's capital structure.[14]  Neither Section 8.8(i) nor any other provision of the Agreement grants Cumulus the right to conduct an exchange offer that would instead *elevate* the Senior Noteholders' priority in the capital structure.  But that is exactly what the Proposed Transaction would do; it is an exchange offer that would provide to each accepting Senior Noteholder a combination of Cumulus common stock and secured debt. The exchange for common stock is expressly permitted under Section 8.8(i), but the exchange for secured debt is not permitted by Section 8.8(i) or any other provision of the Agreement.  Had the parties intended that Cumulus would be permitted to execute an exchange offer of the Senior Notes for secured debt — of which there is no evidence in the Agreement — they could easily have said so in Section 8.8(i).

---

[14]   Repaying the Senior Notes with the proceeds of a stock offering pursuant to Section 8.8(h) would similarly replace the Senior Notes with a subordinate obligation.

Other provisions of the Agreement similarly make clear that when Cumulus repays debt, it cannot do so in a manner that favors certain creditors inconsistently with their respective priority or lien positions.  For example, Section 8.3(o) permits Cumulus to create liens securing any Permitted Refinancing, "<u>provided</u> that such security interests shall not apply to any property or assets that were not collateral for the Indebtedness being refinanced."  Agreement, § 8.3(o). In other words, Cumulus cannot use a Permitted Refinancing to enhance the lien position of existing indebtedness, which is exactly what the Proposed Transaction would do here.  By way of further example, under Section 8.8(h) Cumulus may make payments on the Senior Notes using the cash proceeds from a new stock offering.  *Id.* § 8.8(h).  Thus, as with Section 8.8(i), under Section 8.8(h) Cumulus is allowed to issue lower-priority securities in order to pay off higher-priority indebtedness like the Senior Notes, but not the other way around.  These provisions reinforce the requirement under Section 8.8(j) that Cumulus cannot refinance the Senior Notes in a manner that elevates their lien priority to secured first-lien status.

**B.**     **The Proposed Transaction Is Not A Permitted Refinancing.**[15]

To be a "Permitted Refinancing," a refinancing must satisfy all of the criteria set forth in that definition.  The Proposed Transaction is not a Permitted Refinancing for at least two reasons.

**1. Maturity date.**  To be "permitted," the refinanced debt must have "a final maturity date equal to or later than the final maturity date" it had before the refinancing.  Agreement, § 1.1, "Permitted Refinancing" (ii).  In other words, the New Revolving Facility must have a later maturity date than the Senior Notes currently have.  Under the Proposed Transaction,

---

[15]    Cumulus says that "Although the Credit Agreement does not require it, Cumulus reserves the right to argue that the refinancing complies with Permitted Refinancing."  Pl. Br. at 10 n.7.  But having failed to explain either in its Complaint or in its moving brief any basis upon which the Proposed Transaction is a Permitted Refinancing, Cumulus should not be permitted to raise such an argument for the first time on reply.

Cumulus seeks to satisfy this condition by amending the maturity date for the Revolving Facility to November 23, 2020, which is later than the current 2019 maturity date of the Senior Notes. But this approach does not work if less than 100% of the current Revolving Lenders assign their commitments, because they will retain their original maturity date of December 23, 2018. Since the Proposed Transaction envisions drawing down the full $305 million under the Revolving and Incremental Revolving Facilities, any holdover revolving loan will have a final maturity date which is *not* "equal to or greater than" that of "the Indebtedness being . . . refinanced," *i.e.*, the 2019 Senior Notes. Plaintiff admits this. JPMorgan SMF ¶ 111. The Proposed Transaction does not qualify as a Permitted Refinancing.

**2. Liens.** To be "permitted," if the liens securing the indebtedness being refinanced are subordinate to the liens securing the existing Term Loans, the lien securing the post-refinancing indebtedness must remain subordinated on terms at least as favorable to the Lenders as before. Agreement, § 1.1 "Permitted Refinancing" (vii). In other words, if Cumulus were refinancing a debt with a second lien on Cumulus's assets, the refinanced indebtedness cannot be secured by a first lien. Yet here, Cumulus seeks to refinance an *unsecured* debt and grant its holders a *first lien*. The Agreement does not permit this. Cumulus's reading would improperly allow the unsecured Senior Noteholders to become secured first-lien creditors.

In fact, because the Proposed Transaction would refinance an unsecured indebtedness and create a first lien indebtedness, Cumulus essentially seeks to create a new lien. The Agreement expressly prohibits Cumulus from incurring any new liens: "[T]he Borrower agrees that it shall not . . . [c]reate, incur assume or suffer to exist any Lien upon any of its property, assets, income

or profits." Agreement, §§ 8, 8.3.[16] The Senior Notes being refinanced are not secured by any collateral. Thus, to comply with the Agreement, the amended Revolving Facilities cannot be secured by any collateral.

Since these provisions are not met, the Proposed Transaction is not a Permitted Refinancing and therefore is not "permitted pursuant to the terms [of the Agreement as a whole]."

## CONCLUSION

For the foregoing reasons, JPMorgan respectfully requests that the Court deny Cumulus's summary judgment motion and grant JPMorgan's cross-motion.

Dated: New York, NY                    Respectfully submitted,
      January 27, 2017

      /s/ Thomas C. Rice
      Thomas C. Rice
      Alan Turner
      Matthew T. O'Connor
      David B. Rochelson
      SIMPSON THACHER & BARTLETT LLP
      425 Lexington Avenue
      New York, New York 10017-3954
      Telephone: (212) 455-2000
      Facsimile: (212) 455-2502
      trice@stblaw.com
      aturner@stblaw.com
      moconnor@stblaw.com
      david.rochelson@stblaw.com

      *Attorneys for JPMorgan Chase Bank, N.A.*

---

[16] As noted above, Section 8.3(o) specifically addresses Liens securing any Permitted Refinancing, providing that "such security interests shall not apply to property or assets that were not collateral for the Indebtedness being refinanced." Agreement, § 8.3.